VÍCTOR RAMOS ACEVEDO, peticionario, *v.* TRIBUNAL SUPERIOR, SALA DE SAN JUAN, HON. JUEZ TORRES CARABALLO, demandado.

*Número:* MD-91-3 *Resuelto:* 14 de junio de 1993

*Luis F. Abreu Elías*, abogado del peticionario; *Anabelle Rodrí-guez, Procuradora General*, abogada de El Pueblo; *Carmen Ana Rodríguez Maldonado*, y *Benigno Alicea Alicea*, de la *Sociedad para Asistencia Legal; Manuel Fernós*, Decano de la Universidad Interamericana, *Antonio García Padilla*, Decano de la Escuela de Derecho de la Universidad de Puerto Rico, *José M. Sagardía*, Presidente del Colegio de Abogados, *Juan Santiago Nieves* y *José Juan Nazario de la Rosa*, del Colegio de Abogados de Puerto Rico, *amicii curiae.*

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

La responsabilidad y labor de representar ante el foro judicial a los indigentes que son acusados de la comisión de delito público en nuestra jurisdicción recae, de ordinario y de manera principal, sobre los hombros de los abogados que integran la Sociedad para Asistencia Legal. Dicha institución, una sin fines de lucro, sufraga sus gastos operacionales con fondos, principalmente, provenientes del Gobierno de Puerto Rico; con el producto de la venta de sellos que por disposición de ley, vienen obligados a cancelar los abogados en ciertos y determinados documentos y situaciones, dinero que, en última instancia, se le transfiere a, y paga, la ciudadanía en general; y con donaciones que recibe dicha institución de otros sectores de nuestra sociedad.

En ocasiones, sin embargo, los abogados de la referida Sociedad para Asistencia Legal se ven impedidos de defender a unos imputados de delito en particular; ello, mayor-

mente debido a la existencia de conflictos de intereses en la referida representación. En dichas situaciones, de ordinario, los jueces de instancia designan, al azar y sin metodología alguna, como abogado *de oficio* del imputado en cuestión a uno de los miembros de la profesión *que usualmente se dedica a la práctica de lo criminal en el distrito judicial en que el asunto se está ventilando.*

Dicha "práctica" es la que formalmente se cuestiona, o impugna, en el recurso ante nuestra consideración. Esto es, debemos resolver si la misma —*incorporada a nuestro ordenamiento en las disposiciones de las Reglas 57 y 159 de las vigentes Reglas de Procedimiento Criminal, 34 L.P.R.A. Ap. II*— viola los derechos constitucionales de esos abogados que así son designados.

Al resolver la referida interrogante, lo hacemos teniendo presente —y armonizando— los derechos constitucionales que, como ciudadanos al fin, tienen los abogados que practican la profesión en nuestra jurisdicción, evaluando la posible violación de dichos derechos a la luz de los criterios jurisprudencialmente establecidos a esos efectos; el derecho a una adecuada y efectiva asistencia de abogado que la Constitución del Estado Libre Asociado de Puerto Rico le garantiza a todo ciudadano que es acusado de la supuesta comisión de un delito público y la obligación del Estado de garantizar ese derecho; el poder inherente que, en general, tiene este Tribunal para reglamentar la profesión de abogado en nuestra jurisdicción y, en particular, la autoridad de los tribunales de instancia para dirigir, y regular, los procedimientos que se ventilan en sus respectivas salas; y los postulados y principios contenidos en los cánones de ética que rigen la profesión de abogado.

I

El Tribunal Superior de Puerto Rico, Sala de San Juan, confrontado con la situación de que la Sociedad para Asis-

tencia Legal no podía, por razón de conflicto de intereses, representar al ciudadano Vicente Ayala Sanjurjo —quien estaba acusado de la supuesta comisión de un delito de asesinato en primer grado y de infracciones a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418— designó como *abogado de oficio* de éste al Lcdo. Víctor Ramos Acevedo; abogado que ha dedicado la mayor parte de su vida profesional a la práctica de la profesión en el campo de lo criminal.

La encomienda como abogado de oficio, en su origen, fue aceptada por el licenciado Ramos Acevedo sin objeción, o reclamo, de clase alguna. Como consecuencia de ello, el tribunal de instancia relevó, como abogado de Ayala Sanjurjo, a la Sociedad para Asistencia Legal. La postura, originalmente asumida por el licenciado Ramos Acevedo, sufrió un cambio sustancial. Éste, en escrito a esos efectos radicado ante el foro de instancia, no sólo alegó que su designación como abogado de oficio de Ayala Sanjurjo resultaba inconstitucional, al amparo de las disposiciones pertinentes tanto de nuestra Constitución como de la Constitución federal, sino que reclamó la asignación de fondos para el pago de los gastos en que él pudiera incurrir en la defensa de Ayala Sanjurjo.

Denegada su solicitud por el tribunal de instancia, y habiendo el mismo ordenádole que procediera a representar al imputado en la vista en su fondo del caso, el licenciado Ramos Acevedo se negó a ello. Su negativa tuvo como consecuencia la expedición de una orden de arresto en su contra. Estando dicho abogado detenido en el Centro Judicial de San Juan, se radicó en su nombre, ante este Tribunal, un escrito intitulado "[p]etición de mandamus, moción urgente en auxilio de jurisdicción, y memorando de derecho". Petición de *mandamus*, pág. 1. En el mismo se planteó, como única cuestión, que "[e]s inconstitucional asignar abogados de oficio sin proveerles pago por los ser-

vicios y sin proveerles recursos para representar adecuadamente [a los] indigentes". Íd., pág. 2.

Considerando el recurso radicado como uno de *certiorari, expedimos* el mismo mediante Resolución de fecha 23 de octubre de 1991. En la citada resolución, adicionalmente y en auxilio de jurisdicción, ordenamos la inmediata excarcelación del peticionario Ramos Acevedo hasta que otra cosa se dispusiera; instruimos al licenciado Ramos Acevedo para que, sujeto a las "resultancias de sus planteamientos" y a cualquier derecho que le asista, procediera a representar al acusado Ayala Sanjurjo en el proceso criminal pendiente ante el tribunal de instancia; y, motu proprio, designamos como "amigos del Tribunal" al Colegio de Abogados de Puerto Rico y a las tres (3) Facultades de Derecho existentes en nuestra jurisdicción a los fines "de que nos [ilustraran] en cuanto a los planteamientos envueltos, sus posibles soluciones y alternativas". Resolución de 23 de octubre de 1991, pág. 2. Posteriormente, y mediante Resolución de fecha 13 de noviembre de 1991, admitimos, como "amigos de la Corte", a un grupo de abogados que así lo solicitaron.

Todas las "partes", incluyendo al Procurador General de Puerto Rico, han comparecido. Estando en condiciones de resolver el recurso, procedemos a así hacerlo.

II

La citada Regla 57 de Procedimiento Criminal establece que:

> Si el acusado compareciere sin abogado a responder de la acusación, el tribunal deberá informarle de su derecho a tener abogado defensor y *designará un abogado* para que lo represente en el acto de la lectura de la acusación y en todos los trámites siguientes, a no ser que el acusado renunciare su derecho a asistencia de abogado o pudiere obtener uno de su propia selección. El tribunal concederá al abogado que nombre un

período de tiempo razonable para prepararse para el juicio. *Dicho abogado servirá sin costo alguno para el acusado.* (Énfasis suplido.)(¹) 34 L.P.R.A. Ap. II.

■ El peticionario Ramos Acevedo sostiene que la regla antes transcrita, y la práctica o tradición de los tribunales de nombrar como abogado de oficio a aquellos abogados que, de ordinario, se dedican a la práctica de lo criminal,(²) es inconstitucional debido, principalmente y en síntesis, a que la misma viola la cláusula constitucional sobre igual protección de las leyes, Sec. 7 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, por cuanto establece una clasificación constitucionalmente impermisible; por razón de permitir dicha práctica una incautación de "propiedad" —su trabajo o labor como abogado— por parte del Estado sin compensación y/o en violación del debido procedimiento de ley y al violar las cláusulas pertinentes

---

(¹) Debe tenerse presente, *en adición*, que la Regla 159 de Procedimiento Criminal, *la cual regula los procedimientos ante el Tribunal de Distrito de Puerto Rico*, establece, en lo pertinente, que:

"(a) Asistencia de abogado. Al llamarse un caso para juicio, si el acusado compareciere sin abogado, el tribunal deberá informarle de su derecho a tener asistencia de abogado, y si el acusado no pudiere obtener los servicios de un abogado, el tribunal le nombrará un abogado que lo represente, a no ser que el acusado renunciare a su derecho a tener asistencia de abogado. El abogado que se le nombre por el tribunal prestará sus servicios sin costo alguno para el acusado. El tribunal deberá concederle al abogado un término razonable para preparar la defensa del acusado." 34 L.P.R.A. Ap. II.

(²) Como es sabido, la aplicación selectiva, arbitraria o discriminatoria de un estatuto respecto a una persona, o grupo de personas, puede causar que dicha disposición legal, neutral y constitucional de su faz, redunde en una violación a la cláusula constitucional sobre igual protección de las leyes. *Rodríguez v. Depto. Servicios Sociales*, 132 D.P.R. 617 (1993).

Por otro lado, debe mantenerse presente lo expresado y resuelto por este Tribunal en *Almodóvar v. Méndez Román*, 125 D.P.R. 218, 253–254 (1990), a los efectos de que:

"... si bien es cierto que *el análisis constitucional sobre la igual protección de las leyes* tradicionalmente se ha aplicado en el contexto de clasificaciones legislativas, *el mismo es igualmente aplicable a clasificaciones establecidas o legitimadas jurisprudencialmente.* El examen referente a estas 'clasificaciones judiciales' resulta procedente por razón de que los derechos constitucionales se reclaman contra el Estado y la Rama Judicial es uno de los componentes de éste." (Énfasis suplido.)

de nuestra Constitución que prohíben la "servidumbre involuntaria".(³)

 En lo referente al planteamiento sobre igual protección de las leyes, sabido es que la citada Sec. 7 del Art. II de nuestra Constitución —la cual dispone, en lo pertinente, que "n[o] se negará a persona alguna en Puerto Rico la igual protección de las leyes", Const. E.L.A., ante, ed. 1982, pág. 275— *no* requiere, o exige, un trato igual para todos los ciudadanos; lo que sí prohíbe dicha disposición constitucional en un trato desigual injustificado. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975). A estos efectos, nos ilustra el profesor Serrano Geyls, al expresar, en lo pertinente, que:

> ... el problema central que plantea la aplicacion de la igual protección de las leyes es el de diseñar normas *que permitan* al gobierno establecer clasificaciones *pero* que a la vez protejan a las personas *contra desigualdades indebidas o irrazonables u odiosas* ....
>
> . . . . . . . .
>
> Por todas estas consideraciones, el *principio cardinal* en que se funda la igual protección de las leyes es el de *"trato similar* para personas *similarmente* situadas". (Énfasis suplido.)(⁴)

De manera pues que es completamente permisible que el Estado, mediante legislación a esos efectos, establezca diferencias en el trato, siempre que éstas no creen de su faz

---

(³) El planteamiento del peticionario Ramos Acevedo al amparo de la Sec. 12 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1992, pág. 323, la cual dispone que "[n]o existirá la esclavitud, ni forma alguna de servidumbre involuntaria", *es del todo inmeritorio*. Planteamientos similares, al amparo de la Decimotercera Enmienda de la Constitución federal, *no* han encontrado eco en el más alto Foro federal. *Cf. Hurtado v. United States*, 410 U.S. 578 (1973); *Selective Draft Law Cases*, 245 U.S. 366 (1918); *Butler v. Perry*, 240 U.S. 328 (1916); *Edwards v. United States*, 103 U.S. 471 (1880). Estos casos indican que cuando hay un *deber* envuelto, el requerimiento por parte del Estado o la obligación de cumplir con el mismo, no constituye una servidumbre involuntaria. Véase, además, J.R. Anderson, *Court Appointed Counsel: The Constitutionality of Uncompensated Conscription*, 3 Geo. J. Legal Ethics 503, 514–516 (1990).

(⁴) Véase R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1081–1082.

una clasificación inherentemente sospechosa y no afecten de manera sustancial, un derecho fundamental. *Rodríguez Pagán v. Depto. Servicios Sociales,* ante. Como es de todos conocido, y con el propósito de llevar a cabo dicha evaluación o análisis, los tribunales han creado jurisprudencialmente diversos tipos de escrutinios o criterios. En nuestra jurisdicción, únicamente hemos utilizado *dos* (2) de ellos: el "estricto" y el "tradicional y/o de nexo racional". Véanse: *Vélez v. Srio. de Justicia,* 115 D.P.R. 533 (1984); *Almodóvar v. Méndez Román,* ante.

En el presente recurso nos enfrentamos con un estatuto que de su faz establece una clasificación *no* sospechosa, a saber, entre las personas que pertenecen a la profesión legal y aquellas que no. En cuanto al derecho fundamental alegadamente afectado, por tratarse del derecho al debido proceso de ley en el contexto de una reglamentación de tipo socioeconómica, la validez constitucional del estatuto está sujeta al escrutinio o criterio "tradicional y/o de nexo racional".[5] *Vélez v. Srio. de Justicia,* ante. Bajo este escrutinio, el estatuto impugnado se presume constitucional, correspondiendo el peso de la prueba a quien cuestiona su validez. Será suficiente que el Estado tenga un interés legítimo y que el propósito que se persigue guarde una relación razonable con la ley. Este propósito, sin embargo, no tiene que haber sido articulado ni expresado en la misma. La doctrina sólo exige que pueda *identificarse* un propósito concebible; esto es, cualquier situación o propósito que concebiblemente justifique el estatuto. *Marina Ind., Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64 (1983); *Vé-*

---

[5] Como bien señalara el profesor Anderson en el citado artículo, págs. 518–520, tal clasificación se sostiene con el estándar mínimo racional: "Thus, the real issue is not whether the conscription practice places a greater burden on lawyers than on other citizens. Occupational excises have long been upheld. The real issue is whether there is any rational reason for the distinction." Anderson, ante, pág. 519.

*lez v. Srio. de Justicia*, ante; *Zachry International v. Tribunal Superior*, ante.

■ En relación a la controversia ante nuestra consideración, cobra relevancia e importancia lo preceptuado por la Sec. 11 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, págs. 307-308, la cual, en lo pertinente, garantiza que "[e]n todos los procesos criminales, el acusado disfrutará del derecho ... a tener asistencia de abogado". Sabido es que el derecho a tener representación legal en casos criminales —el cual debe ser uno adecuado y efectivo, *United States v. Cromic*, 466 U.S. 648, 653 (1984)— se ha consagrado como parte fundamental de la cláusula del debido proceso de ley. *Pueblo v. Moreno González*, 115 D.P.R. 298 (1984); *Pueblo v. Gordon*, 113 D.P.R. 106 (1982). Hemos reconocido el derecho de un acusado al disfrute de una adecuada y efectiva asistencia legal en la etapa investigativa, cuando ésta toma carácter acusatorio; en el acto de lectura de acusación; *durante el juicio*; al dictarse sentencia; y en la etapa apelativa. Véanse: *Pueblo v. Ortiz Couvertier*, 132 D.P.R. 883 (1993); *Pueblo v. Sánchez Vega*, 95 D.P.R. 718 (1968); *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765 (1965); *Soto Ramos v. Supert. Granja Penal*, 90 D.P.R. 731 (1964).

■ En consecuencia, no creemos que puede haber duda alguna sobre el hecho de que *el interés del Estado* —dimanante del mandato constitucional contenido en la citada Sec. 11 del Art. II de nuestra Constitución— en que *todo* imputado de delito en nuestra jurisdicción cuente con una adecuada y efectiva asistencia de abogado *es uno que ciertamente cualifica como legítimo*.

■ No existiendo prohibición constitucional absoluta que impida el poder legislativo aprobar legislación —en este caso una regla de Procedimiento Criminal— que tenga el efecto, o consecuencia, de establecer "clasificaciones",

esto es, diferencias según las cuales *se puede tratar a un grupo de personas de un modo diferente al que se trata a otras*,[6] y habiéndose demostrado que en relación con esta clasificación de tipo socioeconómico efectivamente existe un "interés legítimo" de parte del Estado, *no tenemos duda alguna sobre el hecho de que la transcrita Regla 57 de Procedimiento Criminal no viola la cláusula constitucional sobre igual protección de las leyes.*

■ Nos enfrentamos por último, en cuanto a este aspecto de la controversia ahora ante nuestra consideración, al *señalamiento específico de que, conforme se aplica por los tribunales la citada Regla 57 de Procedimiento Criminal,* no todos los abogados en esta jurisdicción quedan afectados por la obligación impuesta por la referida disposición reglamentaria. El peticionario indica que esta práctica da lugar a que los tribunales discriminen en contra de los abogados que practican lo criminal *vis-à-vis* el resto de los abogados en la práctica. Esta situación *alegadamente* hace que la misma *sea inconstitucional en su aplicación.* Véase: *Rodríguez Pagán v. Depto. Servicios Sociales,* ante. Dicho argumento es completamente erróneo. El alegado discrimen es producto de una clasificación que *no* es sospechosa y que es la consecuencia de una reglamentación de tipo socioeconómica, por lo que su validez constitucional dependerá con que se cumpla con el criterio de nexo racional. *Marina Ind., Inc. v. Brown Boveri Corp.,* ante; *Vélez v. Srio. de Justicia,* ante; *Zachry International v. Tribunal Superior,* ante. Véase, además, Anderson, ante. Bajo este criterio la práctica aquí impugnada resulta ser un medio *razonablemente conducente* a la consecución del legítimo interés que persigue el Estado, a saber, que todo imputado de delito en

---

[6] De hecho, la historia referente a la cláusula constitucional sobre la igual protección de las leyes *es una de desigualdad.* La función judicial, *repetimos,* en esta clase de situaciones *se limita* a determinar si la clasificación legislativa establecida ·es constitucionalmente permisible; para lo cual hemos utilizado en nuestra jurisdicción los criterios de "nexo racional" y el "estricto".

nuestra jurisdicción cuente con una adecuada y efectiva asistencia de abogado.

Varios factores abonan, de forma muy especial, a la *razonabilidad* de esta práctica. En *primer* término, aquellos abogados que laboran en el servicio público están *impedidos* de actuar como abogados de oficio. Esto es, existe una *prohibición legal* que así lo impide. En *segundo* término, hay otros abogados en la práctica privada de su profesión que se dedican a menesteres que no tienen relación alguna con el campo de lo criminal; esto es, que no tienen experiencia alguna en el mencionado campo legal. *Dos (2) son las razones que nos impiden incluir a estos últimos dentro del grupo de abogados que pueden, o deben, prestar servicios gratuitos razonables a los indigentes acusados de la comisión de delito en nuestra jurisdicción.*

En *primer* lugar, si así lo ordenáramos estaríamos, en cierto modo, obligando a dichos abogados a *violar* el Código de Ética Profesional. Ello así por cuanto el Canon 18 del referido código de ética establece, en lo aquí pertinente, que *será impropio* que un abogado asuma una representación profesional estando "consciente de que no puede rendir una labor idónea competente" (4 L.P.R.A. Ap. IX) en el asunto sobre el cual trata la misma. En *segundo* lugar, si le asignáramos a un imputado de delito, como abogado, a un miembro de la profesión que no está realmente capacitado para representar, adecuada y efectivamente, a dicho imputado en un proceso criminal, en cierta forma estaríamos *promoviendo* la violación de la cláusula constitucional sobre debido procedimiento de ley. *Pueblo v. Moreno González*, ante; *Pueblo v. Gordon*, ante. *Ello, naturalmente, es inaceptable e improcedente desde cualquier punto de vista.*

## III

El peticionario Ramos Acevedo, en anticipada refutación de lo anteriormente expresado, expone que esa

obligación —la de proveer asistencia de abogado a los indigentes— es *exclusiva* del Estado. *No tiene razón.* Sobre el Estado, no hay duda, recae la obligación exclusiva *de garantizar* que el mandato constitucional antes mencionado sea cumplido. Sobre el Estado, sin embargo, *no* recae la obligación, *en forma única*, de *proveer* esos servicios gratuitos de abogado a los indigentes.([7]) Esta es una *obligación compartida* con los abogados admitidos al ejercicio de la profesión. En palabras del distinguido Juez Cardozo:

> "Membership in the bar is a privilege burdened with conditions." The [attorney] was received into that ancient fellowship for something more than private gain. He became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice. His c[oo]peration with the court was due whenever justice would be imperilled if cooperation was withheld. He might be assigned as councel for the needy, in causes criminal or civil, serving without pay. (Cita omitida.) *People v. Culkin*, 162 N.E. 487, 489 (1928).

El día en que una persona toma el juramento como abogado ante el Tribunal Supremo de Puerto Rico([8]) le es concedido un gran privilegio: el de poder ejercer una profesión, honrosa por demás, que tiene una rica y extraordinaria tradición y que desempeña un importante papel en nuestra sociedad. Ese privilegio, sin embargo, requiere de todos y cada uno de los abogados el compromiso inquebrantable y continuo de velar por el buen funcionamiento de nuestro

---

([7]) Aún así, constituye un hecho irrefutable que el Estado es el *principal proveedor económico* de esos servicios legales gratuitos al indigente acusado de delito. A esos efectos, debe destacarse que el Gobierno de Puerto Rico es el que sufraga prácticamente todos los gastos operacionales de la Sociedad para Asistencia Legal. *Por otro lado*, los ciudadanos de este País también contribuyen al pago de los gastos operacionales de la referida Sociedad; ello, en forma indirecta, mediante la cancelación de aranceles en determinadas circunstancias relacionadas con el otorgamiento de documentos notariales y la suspensión de casos en corte.

([8]) Como paso inicial a su admisión a la práctica de la profesión, los abogados:
"... juran solemnemente que desempeñarán con lealtad los deberes y responsabilidades que como abogado del Estado Libre Asociado de Puerto Rico les impone la Ley y el Código de Ética Profesional; que defenderán la Constitución de los Estados Unidos y la Constitución y las Leyes del Estado Libre Asociado de Puerto Rico contra todo enemigo exterior e interior; y que asumen esta obligación libremente, sin reserva mental ni propósito de evadirla."

sistema de justicia y, por ende, por el bienestar del país en general; lo cual comprende, entre otras, reconocer que existe un *imperioso interés social* en que todo ciudadano que lo necesite, y que sea acusado de la supuesta comisión de un delito público, tenga acceso a los servicios legales que prestan los abogados, la conducta de los cuales deberá siempre ser honrosa y diligente.

La práctica de la abogacía, distinto quizás a otras profesiones, conlleva una seria y delicada función ciudadana pues la misma representa servicio, ética y ejemplo. El abogado no puede meramente ser un "comerciante del derecho" que presta unos servicios exclusivamente a cambio de recibir unos honorarios. Debe mantenerse presente que el éxito de una persona como abogado no se mide exclusivamente a base de lo abultado de su cartera o de su cuenta bancaria.

El éxito del abogado debe medirse por el grado de satisfacción personal que éste obtiene al saber que ha cumplido, en forma eficiente y satisfactoria, con la labor que le fue encomendada por el cliente —pudiente o indigente— que acudió a sus oficinas en busca de ayuda, orientación y justicia.

Todo abogado es un oficial del tribunal[9] y como tal viene obligado a ofrecer sus servicios legales cuando el tribunal le asigne a ello. Cánones 1 y 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. Véase, además, *Powell v. Alabama*, 287 U.S. 45, 73 (1932). Esta obligación surge de manera implícita de la naturaleza y función eminentemente pública de la profesión legal, *In re Pérez Rodríguez*, 115 D.P.R. 810, 811 (1984); *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 788 (1984); *Martínez Rivera v. Sears Roebuck*, 98 D.P.R. 641 (1970), la cual es asumida voluntaria y libremente por todo aspirante al ejercicio de la

---

[9] *In re Rivera Colón*, 63 D.P.R. 713 (1944); *Colón v. Gobierno de la Capital*, 62 D.P.R. 25 (1943); *In re Díaz*, 16 D.P.R. 82 (1910).

abogacía. El abogado, al ser admitido al ejercicio de la profesión se convierte en un ministro ordenado de la justicia, por lo que al ser requerido por un tribunal no debe negar sus servicios a los indigentes. 1 *Thornton, Attorneys at Law* Sec. 86, págs. 143–144, citado en *State v. Becker*, 174 S.W.2d 181, 184 (1943).

Históricamente, se ha considerado como deber de la profesión legal el ofrecer representación gratuita a personas indigentes, acusadas de la supuesta comisión de delito público, cuando un tribunal le indique hacerlo. El aspirante al ejercicio de la profesión legal conoce o debe conocer esta tradicional práctica de la profesión a la que pretende unirse, por lo que, al ingresar a esta noble profesión, la hace suya. En consecuencia no podrá, al ser requerido a cumplir con su obligación de representar gratuitamente al indigente, alegar que constituye una incautación de sus servicios. *United States v. Dillon*, 346 F.2d 633, 635 (9no Cir. 1965), *cert.* denegado, 382 U.S. 978 (1966). Véase, también, *Williamson v. Vardeman*, 674 F.2d 1211 (8vo Cir. 1982).

En términos más concretos, el Canon 1 del Código de Ética Profesional, ante, expone que:

> Constituye una obligación fundamental de todo abogado luchar continuamente para garantizar que toda persona tenga acceso a la representación capacitada, íntegra y diligente de un miembro de la profesión legal.
>
> En la consecución de este objetivo el abogado *debe aceptar y llevar a cabo toda encomienda razonable de rendir servicios legales gratuitos a indigentes, especialmente en lo que se refiere a la defensa de acusados y a la representación legal de personas insolventes.* (Énfasis suplido.)

La obligación impuesta por el transcrito canon es complementada por las disposiciones del Canon 38 del Código de Ética Profesional, ante, el cual le exige al abogado "esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, *aunque el así hacerlo*

*conlleve sacrificios personales"*. (Énfasis suplido.) Véanse: *In re Sánchez Rodríguez*, 123 D.P.R. 876 (1989); *In re Roldán Figueroa*, 106 D.P.R. 4, 12 (1977).

## IV

Este deber u obligación del abogado no debe trascender, sin embargo, el lindero de lo razonable, razón por la cual la posición sostenida por el peticionario Ramos Acevedo *no* es del todo inmeritoria. Resulta ciertamente preocupante su afirmación a los efectos de que las asignaciones como abogado de oficio a nivel de instancia son hechas, de ordinario, en forma caprichosa y repetitiva. Ello, naturalmente, puede resultar en la imposición de un obligación que resulte irrazonable para un abogado dedicado a la práctica privada de su profesión que, debido a esas continuas y arbitrarias designaciones, se puede ver imposibilitado de ganar el sustento de su familia. Dicho "sistema" es uno que, no hay duda es susceptible de ser aplicado de forma inconstitucional ya que una aplicación selectiva, arbitraria o discriminatoria de un estatuto respecto a una persona, o grupo de personas, puede causar que dicha disposición legal, neutral y constitucional de su faz, redunde en una violación a la cláusula constitucional sobre igual protección de las leyes. *Rodríguez Pagán v. Depto. Servicios Sociales*, ante.

Estamos conscientes del hecho que la situación referente a la asignación de abogados de oficio es una que puede variar de un distrito judicial a otro; esto es, las necesidades en este aspecto de las diferentes regiones judiciales no necesariamente tienen que ser las mismas. Debido a ello, nos abstenemos de implantar, en este momento, un "sistema uniforme" sobre asignaciones de abogados de oficio aplicable y obligatorio para todas las regiones judiciales de nuestro País. Dicha situación debe ser objeto de un estudio más abarcador y profundo, por el Secretariado

de la Conferencia Judicial adscrito a este Tribunal;[10] luego de lo cual estaremos en mejor posición, *bajo nuestro poder de reglamentación*, de implantar un *sistema uniforme* a esos efectos.

Ello no obstante, y en lo que se implanta dicho sistema, somos del criterio que los señores Jueces Administradores de las diferentes regiones judiciales deberán de inmediato —conforme sus necesidades y circunstancias particulares— esbozar y elaborar un plan mediante el cual se "divida", de una manera equitativa, razonable y justa, la "carga" que la asignación de oficio representa para los abogados que practican lo criminal en dicha región judicial; de forma tal que todos los abogados participen en la misma y la práctica individual privada de ninguno de ellos se vea afectada en forma irrazonable.

Tampoco podemos darle la espalda al planteamiento de los abogados comparecientes de que la designación como abogado de oficio en un caso en particular —*que sea extremadamente complejo*— puede afectar de manera sustancial e irrazonable la práctica privada, y situación económica personal, del abogado así designado; *ello por razón de que el proceso pueda prolongarse por un tiempo extremadamente largo*. En las ocasiones en que ello ocurra, el abogado designado de oficio en el mismo podrá plantearle la situación al Juez Administrador de la región judicial en controversia y éste tendrá autoridad para ordenar que el Estado le pague a dicho abogado una suma razonable, por horas trabajadas[11], decisión que, naturalmente, estará sujeta a revisión por este Tribunal. Ello en vista de que en tales casos la obligación que se le impone a dichos abogados trasciende el lindero de lo razonable que limita el ám-

---

[10] De hecho, coétaneamente con la emisión y certificación de esta ponencia estamos instruyendo al Secretariado para que el asunto de marras se estudie a la mayor brevedad posible, de forma prioritaria.

[11] Hasta un máximo de veinticinco dólares ($25) por "hora de oficina y de investigación del caso" y hasta un máximo de cuarenta dólares ($40) por "hora en corte".

bito del deber que les imponen los cánones de ética profesional y la tradición.

 Por último, somos del criterio que todo abogado que sea designado de oficio para representar a un indigente tiene derecho a que el Estado le pague *todos* los gastos, *necesarios y razonables*, en que él incurra en la defensa de dicho cliente indigente.[12] El reclamo y solicitud de reembolso de esos gastos deberá ser dirigido, dentro de un término razonable, al Juez Administrador de la región judicial en controversia mediante la radicación de una declaración jurada del abogado, en la cual se deberán detallar los gastos en que se incurrió. En protección del patrimonio del Estado, sin embargo, advertimos que cuando se trate de un gasto sustancial,[13] el abogado deberá obtener permiso, por adelantado, del mencionado Juez Administrador para poder incurrir en, y recobrar, el mismo.[14]

## V

Surge de los autos que el peticionario Ramos Acevedo, en fiel cumplimiento de nuestra Resolución de fecha 23 de octubre de 1991, representó al acusado Ayala Sanjurjo en el juicio que se le celebró al mismo ante el tribunal de instancia, siendo absuelto el mencionado imputado de los cargos de asesinato en primer grado e infracción a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, ante, que en su contra había radicado el Ministerio Fiscal. La posición que dicho abogado sustentara y planteara ante el tribunal de instancia y ante este Tribunal, por otro lado, no era una totalmente carente de méritos. En vista a lo antes expuesto, consideramos procedente dejar *sin* efecto la orden

---

[12] La obligación impuesta por los citados cánones del Código de Ética Profesional no debe acarrear la aportación del abogado de dinero de su propio peculio.

[13] Esto es, en exceso de doscientos cincuenta dólares ($250).

[14] Dicha decisión —emitida luego de la correspondiente vista adversativa— estará, igualmente, sujeta a revisión por este Tribunal.

de arresto, por desacato, que contra él dictara el mencionado foro de instancia.

Finalmente, se devuelve el caso al Tribunal Superior, Sala de San Juan, para que dentro del término de diez (10) días, contado el mismo a partir de la fecha del recibo del mandato, el licenciado Ramos Acevedo reclame, mediante detallada declaración jurada a esos efectos, los gastos razonables y necesarios en que incurrió en la defensa del cliente que le fuera asignado de oficio. En adición, el referido foro de instancia deberá resolver, al amparo de lo expresado en la Parte IV, si resulta procedente en el presente caso pagarle honorarios al referido abogado por razón de que la dilucidación del caso tomó un tiempo extremadamente largo.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Fuster Berlingeri emitió una opinión concurrente. El Juez Asociado Señor Hernández Denton emitió una opinión concurrente y disidente. El Juez Asociado Señor Negrón García emitió una opinión disidente.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Fuster Berlingeri.

Tenemos ante nos el planteamiento de si la norma tradicional de designar a un abogado como de oficio en la defensa de un acusado viola los derechos constitucionales del abogado.

El planteamiento referido requiere examinar —aunque sea brevemente— los fundamentos teóricos y normativos sobre los cuales se erige la tradicional designación de los abogados de oficio. Las distintas bases reales que pueden haber para cuestionar legítimamente la constitucionalidad de esta consuetudinaria práctica, giran todas esencial-

mente en torno a la *justificación* de tal designación. Si existen razones de preponderante interés público que apoyen la designación de oficio, se desvanecen en general los planteamientos sustanciales de inconstitucionalidad.

Reducido el asunto a su médula, la designación de oficio se justifica con base a dos fundamentos principales. El primero tiene que ver con la *función social del abogado*. En el preámbulo del Código de Ética Profesional que rige la conducta de los abogados en Puerto Rico —como principio rector que informa todos los cánones de ese Código— se destaca el criterio de que la *misión de administrar la justicia en el país recae principalmente sobre la profesión jurídica*. Se afirma allí que la existencia en Puerto Rico de un orden jurídico íntegro y eficaz, sin el cual no es posible la convivencia social, depende del abogado. 4 L.P.R.A. Ap. IX. En vista de tan alto ministerio, se concibe al abogado como un funcionario de los tribunales. *Pueblo v. Susoni*, 81 D.P.R. 124 (1959).

Esta excelsa concepción de la función del abogado no es producto de la hipérbole. En el campo de la teoría social sobre las democracias contemporáneas, esa concepción se deriva del análisis sociológico de las funciones del Derecho, respecto a las cuales las funciones del abogado son un concomitante esencial. Conforme a la teoría social aludida, las sociedades contemporáneas caracterizadas por un avanzado grado de organización política y económica, secularizadas y pluralistas como son, dependen primordialmente del sistema jurídico para atender sus complejos problemas de convivencia colectiva. Véase R.M. Unger, *Law in Modern Society*, Nueva York, Ed. Free Press, 1976. Las varias funciones que realiza el Derecho en estas sociedades son esenciales para hacer posible la vida en comunidad. Esas funciones del Derecho, a su vez, requieren como condición sine qua non que exista una clase profesional que las realice propiamente. Las Constituciones, leyes y reglas no son suficientes para que el Derecho llene su cometido. La par-

ticipación activa, eficaz y creadora de los abogados es igualmente necesaria. Las funciones de los abogados vienen a ser entonces un elemento indispensable del entramado colectivo. De ahí que autores como K. Krastin hayan afirmado que si todos los abogados de una polis contemporánea murieran repentinamente, el proceso social comenzaría a degenerarse instantáneamente y procedería a la degeneración total rápidamente.(¹)

No es posible hacer aquí una elaboración más detallada de las funciones del Derecho y de las de los abogados que están vinculadas con aquéllas. Unas y otras se han discutido ampliamente en la literatura científica y profesional, sobre todo en algunas de las obras principales de la sociología del Derecho.(²) Además, no es necesario hacerlo porque lo que ya se ha apuntado de modo sucinto, explica suficientemente por qué la función del abogado está revestida de un altísimo interés público. Esto, a su vez, justifica por qué nuestro propio Derecho normativamente considere al abogado como un funcionario de los tribunales, y, por lo tanto, sujeto a designaciones de oficio.

## II

El segundo fundamento esencial, que justifica la designación de oficio tiene que ver con la posición privilegiada que ocupa el abogado en la estructura social. Precisamente por la importancia de las funciones que realiza, el abogado disfruta de considerables prerrogativas que le concede el Estado, que a modo de reciprocidad, acreditan que se le

---

(¹) K. Krastin, *The Lawyer in Society — A Value Analysis*, 8 W. Reserve L. Rev. 409 (1957).

(²) Véase J.B. Fuster, *La misión del abogado en el mundo contemporáneo y sus implicaciones para las escuelas de Derecho, el Tribunal Supremo y el Colegio de Abogados*, 36 Rev. Jur. U.P.R. 579 (1967), y las obras allí citadas. Véase, también, J.B. Fuster, *Los abogados de Puerto Rico: fundamentos para una sociología de la profesión legal*, 2da ed., San Juan, Ed. C. Abo. P.R., 1975.

exija determinada conducta a los abogados, incluyendo la de defender gratuitamente a acusados menesterosos.

Los abogados, como clase togada, comparten el monopolio que el Estado les concede sobre las tareas y labores jurídicas de la comunidad. Disfrutan del privilegio exclusivo de la representación legal; del privilegio exclusivo para conducir los asuntos judiciales como jueces; del privilegio exclusivo del asesoramiento legal, y del privilegio exclusivo de la redacción y autenticación de escrituras y otros documentos notariales. Este monopolio, que el Estado hace valer estrictamente, resulta en cuantiosos beneficios económicos[3] y de otra índole para los abogados, al punto que una estudiosa de las ciencias sociales en Puerto Rico ha señalado que ninguna otra profesión es tan atractiva a los jóvenes talentosos del país como la abogacía, la que puede considerarse como la de los *shaman* contemporáneos.[4] Este valioso monopolio compensa la carga que representa en ocasiones la designación de oficio. Véase B.A. Green, *Court Appointment of Attorneys in Civil Cases: The Constitutionality of Uncompensated Legal Assistance*, 81 Colum. L. Rev. 366, 388 (1981).

## III

Existen, pues, poderosas razones de preponderante interés público que justifican plenamente la designación de oficio, frente a las cuales se desvanecen en general los planteamientos de inconstitucionalidad. Lo anterior no obstante, es menester reconocer que hay otras realidades sobre la abogacía que complican el análisis del asunto ante nuestra consideración. *Existe el riesgo de que la designación de oficio recaiga con frecuencia indebida sobre unos pocos abogados.* Se alega que la representación gratuita de

---

[3] Véase Fuster, *op. cit.*, págs. 37–43.

[4] Fuster, *op. cit.*, págs. 19–21.

acusados menesterosos tiende a ser cada día más labor de una minoría dentro de la profesión. No tenemos datos empíricos actualizados sobre este asunto, por lo cual no podemos precisar cuál es la dimensión del problema, si es que existe uno. Pero hay razones que sugieren claramente la existencia del riesgo aludido. Por un lado, la inmensa mayoría de los abogados del país no postulan en casos criminales.[5] Como la designación de oficio sucede de ordinario en las salas de los tribunales donde se ven los casos penales, la práctica usual es hacer la designación a los abogados que allí concurren, limitándose esa designación a la pequeña minoría de abogados que ejercen en el campo del derecho penal. Por otro lado, la profesión está afectada por una dinámica de "comercialización" que es antitética a prácticas como la designación de oficio. Amplios sectores de la abogacía no perciben su vocación como una "profesión", sino como una *mera ocupación lucrativa*. Véase J.B. Fuster, *Los abogados de Puerto Rico: fundamentos para una sociología de la profesión legal*, 2da ed., San Juan, Ed. C. Abo. P.R., 1975, págs. 110–114. Existe, entre tales abogados, un profundo abismo entre lo que se espera de ellos como miembros de la profesión jurídica y lo que ellos en efecto están dispuestos a hacer como tal. En consecuencia, se evitan y hasta se resisten las designaciones de oficio.

Las anteriores consideraciones nos imponen la responsabilidad de examinar a fondo pronto, con bases empíricas, el problema de la representación legal de acusados menesterosos y su relación con la práctica judicial de designar abogados de oficio. Es menester acopiar los datos necesarios que nos permitan saber si en el país se garantiza de forma adecuada el derecho fundamental a la representación legal en casos penales cuando se trata de indigentes. Es menester, además, conocer si la designación de oficio recae, indebidamente, sólo en unos pocos abogados. Finalmente, es menester también estudiar a fondo las posibles

---

[5] Fuster, *op. cit.*, págs. 49–53.

alternativas para atender el problema, si existe uno, luego de consultar tanto a las autoridades de las ramas políticas del Gobierno como a la profesión en sí. Cualquier alternativa que finalmente se adopte, de ser una necesaria, debe estar anclada en lo posible en el compromiso entusiasta de la profesión para que tenga cimientos reales y pueda ser efectiva.

Hasta que el estudio contemplado se realice, cualquier intento por proveer remedios respecto al asunto ante nos es prematuro. Sin embargo, mientras se realiza tal estudio, los tribunales de instancia deben ejercer con mucha cautela su facultad de hacer designaciones de oficio. Han de tener muy en cuenta que es menester hacer tales designaciones *razonablemente*. Deben velar por que dichas designaciones se distribuyan entre los abogados de la comunidad lo más amplia y equitativamente posible. En particular, no deben insistir en una particular designación de oficio si el abogado a quien se le hace demuestra fehacientemente que ya tiene o ha atendido en el pasado reciente otras designaciones, por lo cual tal nueva designación sería irrazonable. Así se evitan cargas muy onerosas sobre abogados particulares, que en tales casos, además de injustas, podrían ser inconstitucionales.

## – O –

Opinión concurrente y disidente emitida por el Juez Asociado Señor Hernández Denton.

Concurrimos con la mayoría en cuanto determina que la designación del Lcdo. Víctor Ramos Acevedo como abogado de oficio del acusado no es inconstitucional per se.

Sin embargo, entendemos que, debido a la complejidad de la controversia sobre la designación de abogados de oficio tanto en casos civiles como criminales, el asunto debe ser reglamentado por este Tribunal. Tenemos el criterio de que la mayoría de este Tribunal, en esta etapa, no debe

improvisar soluciones apresuradas que no tomen en consideración los distintos intereses en conflicto mediante un proceso que asegure la debida participación de todos los sectores de la profesión.

Aunque partimos de la premisa de que existe una gran necesidad de servicios legales de calidad para los indigentes, la variedad y complejidad de alternativas, los costos para el erario y los posibles perjuicios que puedan sufrir los derechos sustantivos de los abogados, prudencialmente aconsejan referir este asunto a la consideración de un proceso reglamentario. De esta manera, se podrían examinar integralmente las diferentes dimensiones de esta controversia deontológica y ofrecer a todos los abogados una oportunidad de expresar sus respectivos criterios.

Con estas reservas y sin prejuzgar la extensión del deber ético de asistencia legal de indigentes a otras áreas y miembros de la profesión, concurrimos con la confirmación de la designación del Lcdo. Víctor Ramos Acevedo como abogado de oficio del acusado y disentimos en cuanto a los demás pronunciamientos.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

Es *INCONSTITUCIONAL* la decisión mayoritaria que hoy impone *solamente* a los abogados que practican en el área de lo criminal la carga onerosa y exclusiva de un deber ético que, *en su origen, vincula y es responsabilidad de toda la profesión legal.* De su faz, el remedio es trunco, ya que habiendo alternativas racionales, preserva un modus operandi ARBITRARIO. Además, es patentemente *INJUSTA*, pues ignora las realidades de la gran masa de puertorriqueños pobres, quienes diariamente carecen de asesoramiento legal para canalizar adecuadamente sus necesidades y, a la par, se exponen a que se les dispense justicia en estado de indefensión. "[E]n el fondo de los grandes

dolores humanos hay una cuestión de conducta, conducta del que los sufre y conducta de quienes acaso los producen." A. Posada, *Estudio sobre el Derecho y la cuestión social*, en la versión española de la obra de A. Menger, *El derecho civil y los pobres*, Madrid, Librería Gen. de Victoriano Suárez, 1898, pág. 6. *Martínez v. McDougal*, 133 D.P.R. 228 (1993), opinión disidente.

Como demostraremos, la *única* forma en que puede sostenerse la validez de la designación de abogados de oficio en el área de lo criminal es imprimirle *al abogado, como clase, una nueva dimensión y retomar conciencia solidarista de que es un instrumento de la paz social, forjador dinámico del derecho y socio-gestor de la justicia.* Exige adoptar un sistema integral, abarcador y compulsorio mediante el cual todo abogado —salvo excepciones justificadas— provea un mínimo anual de servicios a los pobres. Después de todo, "[e]l descargo de la función social de los miembros de la profesión jurídica está atado inexorablemente al sistema democrático puertorriqueño ...". *In re Colton Fontán*, 128 D.P.R. 1, 6 (1991).(¹)

"La defensa del reo es, por otra parte, un elemental deber de comprensión humana, con hondo arraigo en el derecho natural. Un proceso acusatorio sin defensa sería contrario a las normas de equidad. *Tan indispensable es para*

---

(¹) Véanse, además: B. Fernández García, *El abogado ante la evolución social*, 1 Rev. Der. Leg. Jur. C. Abo. P.R. 6 (1935–1936); R. Atiles Moreu, *El abogado como factor social*, 3 Rev. Jur. U.P.R. 266 (1934); C. Santana Becerra, *Esta sacerdotal profesión nuestra*, 1 (Núm. 2) Rev. Jur. U.I.A. 15 (1964); E.B. Santiago Ortiz, *Breves apuntes sobre la función del abogado a través de la historia y su influencia en la sociedad*, 2 (Núm. 1) Rev. Jur. U.I.A. 97 (1965); C.M. Piñeiro y del Cueto, *La función social de la abogacía*, 1 (Núm. 1) Rev. Jur. U.I.A. 26 (1964); J. Benítez, *La Función Social del Abogado*, 17 Rev. C. Abo. P.R. 225 (1957); J.B. Fuster, *Los cánones de ética y la buena conducta profesional*, XXXII (Núm. 4) Rev. Jur. U.P.R. 661 (1962); M. Abreu Castillo, *La responsabilidad de un abogado en una sociedad en vías de evolución*, 23 Rev. C. Abo. P.R. 299 (1963); J.E. Robles Rosario, *Ética Profesional*, XLVI (Núms. 1–2) Rev. Jur. U.P.R. 225 (1977); J. López Vilanova, *En torno a "Los Abogados de Puerto Rico' y la profesión legal: ocupación o especialización*, 11 (Núm. 3) Rev. Jur. U.I.A. 853 (1977); J. Trías Monge, *La Abogacía en Puerto Rico*, 42 Rev. C. Abo. P.R. 389 (1981); J. Portuondo y de Castro, *La Profesión de Abogados*, 65–68 Rev. Der. Pur. 73 (1977–1978); F.A. Avilés, *Responsabilidad legal y moral del abogado, del juez y del ciudadano con la administración de la justicia*, 29 Rev. C. Abo. P.R. 119 (1968).

*el juez el concurso del fiscal como el del defensor. Entre los argumentos de uno y otro, será más seguro para él encontrar la exacta valoración de los hechos."* (Énfasis suplido.) S. Syro Giraldo, *Derecho*, 42 Rev. C. Abo. P.R. 51–52 (1970).

Estas expresiones compendian el axioma fundamental sobre la razón de ser del profundo deber ético en el cual se apoya la tradición jurídica de *defensa* o *abogado de oficio.* "Esta consideración de lo deontológico a modo de una *carga específica* de responsabilidad profesional, entendemos constituye el *alma* de todo sistema deontológico." (Énfasis suplido.) P.M. Casado Coca, *Abogacía y deontología de la indefensión,* 523 Rev. Gen. Der. 1679, 1683 (1988).

## I

El 11 de julio de 1991 el Tribunal de Distrito, Sala de San Juan (Hon. José A. Caquías, Juez), designó al Lcdo. Víctor Ramos Acevedo para representar al acusado Vicente Ayala Sanjurjo en un caso de asesinato e infracciones a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418. La designación fue *de oficio*, sin mediar ofrecimiento o reclamo alguno de remuneración económica. De ese modo, dicho abogado sustituyó y relevó a la Sociedad para Asistencia Legal por existir un conflicto de intereses con el principal testigo de cargo.

Posteriormente, Ramos Acevedo solicitó al tribunal que le asignara fondos para cubrir los gastos que conllevaba la preparación de una defensa adecuada. Planteó que su designación como abogado de oficio era inconstitucional por infringir el Art. II, Sec. 12 de nuestra Carta de Derechos, L.P.R.A., Tomo 1, y la Enmienda V de la Constitución federal. Aunque el tribunal permitió litigar en *forma pauperis*, denegó su solicitud y ordenó la celebración del juicio. Ramos Acevedo rehusó entrar a ventilarlo. Alegó no estar preparado. Con vista a esa actuación, el Tribunal Superior

(Hon. José Torres Caraballo, Juez), ordenó su arresto y encarcelación.

Ramos Acevedo acudió ante nos mediante *petición de mandamus y moción urgente en auxilio de jurisdicción*. Acogimos su pedido como un *certiorari* y ordenamos su inmediata excarcelación, la continuación del proceso criminal contra Ayala Sanjurjo y que Ramos Acevedo, en el descargo fiel de su encomienda, lo representara, todo ello sin menoscabo de las resultancias de sus planteamientos.(²)

Aparte de su comparecencia y la del Procurador General, *sua sponte* unimos en calidad de *amicii curiae* al Colegio de Abogados, a la Sociedad para Asistencia Legal y a las Facultades de Derecho de la Universidad de Puerto Rico y de la Universidad Interamericana. Por iniciativa propia, se unieron los abogados Carmelo Pestaña Segovia, Antonio Sagardía Sánchez, Marilú Guzmán, Julio Fontánez, Fernando Carlo y Luis F. Abréu Elías. Tenemos el beneficio de sus excelentes alegatos.

Todos coinciden en que reviste gran interés público adjudicar si la norma tradicional de designar de oficio a un abogado en una causa criminal viola sus derechos constitucionales. No sólo están en juego principios que atañen a importantes postulados básicos del derecho constitucional, sino también valores relacionados con los cánones de ética que reglamentan el ejercicio de la abogacía; el funcionamiento normal de los tribunales, en especial el sistema de justicia criminal, y el derecho de los acusados a una representación legal adecuada.

De entrada, se impone el esbozo de las premisas fundamentales y el trasfondo doctrinario y operacional que sirven de antecedentes.

---

(²) Conforme los autos originales, Ramos Acevedo acató nuestro mandato provisional. Ante el foro de instancia, se celebró el juicio y Ayala Sanjurjo fue absuelto.

## II

Nuestra Constitución y la federal reconocen plenamente que los acusados indigentes tienen derecho a que el Estado les provea una representación legal adecuada en todas las etapas cruciales del proceso. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1; *Pueblo v. Ortiz Couvertier*, 132 D.P.R. 883 (1993); *Rivera Escuté v. Jefe Penitenciaría*, 92 D.P.R. 765, 774–775 (1965); *Soto Ramos v. Supert. Granja Penal*, 90 D.P.R. 731, 734 (1964); Emda. VI, Const. EE. UU., L.P.R.A., Tomo 1; *Wheat v. United States*, 486 U.S. 153 (1988); *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Argersinger v. Hamlin*, 407 U.S. 25 (1972); *United States v. Gouveia*, 467 U.S. 180, 189–190 (1984).([3]) Así lo plasma la Regla 159(a) de Procedimiento Criminal, 34 L.P.R.A. Ap. II, para el acusado de cualquier delito. Se extiende a todo momento crítico del procedimiento a partir del inicio de la acción penal, durante el juicio, la lectura de sentencia y la primera apelación. *Pueblo v. Sánchez Vega*, 95 D.P.R. 718 (1968); *Soto Ramos v. Superintendente*, supra; *Evitts v. Lucey*, 469 U.S. 387 (1985). Aún en causas inmeritorias, el abogado en apelación no puede abandonarlas sin presentar un *Anders brief* al tribunal. *Anders v. California*, 386 U.S. 738 (1967). Véase E.L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, pág. 525 esc. 26. Más allá de esa dimensión, tenemos los pronunciamientos de *Miranda v. Arizona*, 384 U.S. 436, *cert.* denegado, 385 U.S. 890 (1966), y su progenie en

---

([3]) En la esfera federal, este derecho ha crecido notablemente. Véanse: *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973); *Argersinger v. Hamlin*, 407 U.S. 25, 40 (1972); *Coleman v. Alabama*, 399 U.S. 1, 9–10 (1970); *Mempa v. Hay*, 389 U.S. 128, 137 (1967); *United States v. Wade*, 388 U.S. 218, 237 (1967); *In re Gault*, 387 U.S. 1, 41 (1967); *Miranda v. Arizona*, 384 U.S. 436, 469, *cert.* denegado, 385 U.S. 890 (1966).

Abarca todo delito que apareje pena de reclusión —*Argensinger v. Hamlin*, supra— y ninguna convicción en un juicio sin asistencia de abogado puede usarse luego para fines de reincidencia. *Baldasar v. Illinois*, 446 U.S. 222 (1980). Aunque no hay derecho a asistencia de abogado cuando el acusado sólo puede ser sentenciado al pago de una multa, *Scott v. Illinois*, 440 U.S. 367 (1979), sí debe garantizarse cuando el delito imputado apareja pena de reclusión.

cuanto al derecho a asistencia de abogado en el interrogatorio de sospechosos bajo custodia, corolario del derecho constitucional contra la autoincriminación. *Rivera Escuté v. Jefe Penitenciaría*, supra.

La asistencia tiene que ser *diligente y adecuada*, no meramente pro forma. *Pueblo v. Ortiz Couvertier*, supra; *Pueblo v. Ríos Maldonado*, 132 D.P.R. 146 (1992); *Pueblo v. Morales Suárez*, 117 D.P.R. 497, 500–502 (1986); Chiesa, *op. cit.*, Sec. 710, págs. 552–561; *United States v. Cronic*, 466 U.S. 648, 653–652 (1984); *Cugler v. Sullivan*, 466 U.S. 335 (1980).

Por último, este derecho no tolera la representación conjunta de coacusados en situaciones de conflicto de intereses. *Pueblo v. Gordon*, 113 D.P.R. 106 (1982); Chiesa, *op. cit.*, Sec. 711, págs. 561–565. Los tribunales tienen la obligación de investigar motu proprio sobre el conflicto potencial de la representación conjunta de coacusados e informarles sobre su derecho a una representación adecuada, y que, en caso de conflicto, son acreedores a una representación individual; este derecho se extiende a la vista preliminar. *Pueblo v. Padilla Flores*, 127 D.P.R. 698 (1991).

## III

En Puerto Rico, históricamente el derecho a la asistencia de abogado a imputados indigentes en causas penales ha sido sufragado sustancialmente por el Estado. *Vega v. Luna Torres*, 126 D.P.R. 370 (1990). En época reciente, la Ley Núm. 91 de 29 de abril de 1940 (4 L.P.R.A. secs. 426–429) estableció el cargo de defensor público. En el umbral de la Constitución, la Ley Núm. 11 de 24 de julio de 1952 (4 L.P.R.A. sec. 61 *et seq.*) aumentó su número a diez (10); les prohibió ejercer la práctica privada, y delegó en el Juez Presidente de este Tribunal la facultad de nombrarlos y asignarlos a las diferentes salas del Tribunal Superior,

conforme las necesidades del servicio. 4 L.P.R.A. secs. 361 y 391.

En 1955, un grupo de abogados y ciudadanos preocupados por la eficaz y adecuada representación de los pobres, crearon la "Sociedad para Asistencia Legal", corporación sin fines de lucro. Su objetivo fue, y sigue siendo, "promover la justicia para los insolventes económicos, facilitándole servicios de abogados para garantizar la igual protección de las leyes y para alentar la fe en la justicia". *González v. Alicea, Dir. Soc. Asist. Legal*, 132 D.P.R. 638 (1993); E.A. Brownell, *Asistencia Legal en Puerto Rico*, 15 Rev. C. Abo. P.R. 229 (1954–1955). La Asamblea Legislativa asignó aportaciones económicas para subvencionarla, lo que ha permitido el crecimiento y mejoramiento de sus servicios.[4]

Aunque dicha entidad tiene la misión de proveer asistencia legal a los indigentes, la insuficiencia de abogados por falta de recursos económicos y el impedimento de representación conjunta de coacusados, no le ha permitido atender todos los casos o asuntos referídoles. T. Picó Silva, *La Sociedad de Asistencia Legal: ¿un problema de responsabilidad profesional o del derecho a representación legal?*; *Pueblo v. Santiago*, 47 (Núms. 3–4) Rev. Jur. U.P.R. 677 (1978). En esas situaciones, como mecanismo auxiliar complementario, la práctica judicial ha sido designar un abogado privado sin compensación alguna. ¿A qué visión ha respondido esta práctica?

---

[4] Para esto, anualmente se asigna casi tres millones de dólares ($3,000,000). Además, mediante legislación específica ha provisto mecanismos para su solvencia económica. Con la aprobación de la Ley Núm. 94 de 14 de diciembre de 1991 (4 L.P.R.A. sec. 896), que aumentó a dos dólares ($2) el sello notarial para cancelarse en toda declaración jurada o afidávit, se confiaba aumentar los ingresos de la Sociedad, entre uno punto ochenta y nueve millones de dólares ($1,890,000) y dos millones de dólares ($2,000,000) anuales. Además, dicha entidad recibe alrededor de trescientos setenta y cinco mil dólares ($375,000) anuales en concepto del pago del arancel de suspensión de casos criminales. En resumen, la totalidad de los fondos con que cuenta la Sociedad provienen directa o indirectamente del Gobierno de Puerto Rico.

# IV

Como en otras jurisdicciones, aquí ha prevalecido la idea del abogado como funcionario del tribunal,[5] concepción plasmada jurisprudencialmente e incorporada en las Reglas de Procedimiento Criminal y los cánones del Código de Ética Profesional.

Al respecto, las Reglas 57 y 159 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, le confieren autoridad a los jueces del Tribunal de Primera Instancia para nombrar abogados de oficio a los acusados que no cuenten con los recursos económicos para contratar uno. Esta reglamentación parte de una premisa apuntalada en normas de derecho consuetudinario: la obligación de los abogados a desempeñarse como funcionarios del Tribunal cuando les sea requerido.

Por otro lado, el Canon 1 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, dispone:

> Constituye una obligación de todo abogado luchar continuamente para garantizar que toda persona tenga acceso a la representación capacitada, íntegra y diligente de un miembro de la profesión legal.
>
> En la consecución de este objetivo el abogado debe aceptar y llevar a cabo *toda encomienda razonable* de rendir servicios legales gratuitos a indigentes, especialmente en lo que se refiere a la defensa de acusados y a la representación legal de

---

[5] La obligación de garantizar este derecho constitucional es del Estado. Aunque el Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, caracteriza a los abogados "funcionarios del tribunal"; ello no equivale a "funcionario público". En el contexto de la Cláusula de Privilegios e Inmunidades, véanse: *Supreme C. of N.H. v. Piper*, 470 U.S. 274, 281 esc. 12 (1985); *Supreme Court of Virginia v. Friedman*, 487 U.S. 59 (1988).

Al igual que otros profesionales —médicos, ingenieros, arquitectos— los abogados pueden producir "servicios" sólo mediante la autorización del Estado. Sin embargo, contrario a otros profesionales, los abogados son reglamentados estrictamente por este Tribunal Supremo, pueden ser disciplinados y están sujetos a perder su licencia por incumplir con los cánones de ética.

Notamos, sin embargo, cómo la Ley Núm. 79 de 28 de junio de 1978 (29 L.P.R.A. sec. 71 *et seq.*), impone a todo profesional relacionado con la salud, que aspire a una licencia permanente, practicar por un (1) año en el servicio público del país.

personas insolventes. La ausencia de compensación económica en tales casos no releva al abogado de su obligación de prestar servicios legales competentes, diligentes y entusiastas.

También es obligación del abogado ayudar a establecer medios apropiados para suministrar servicios legales adecuados a todas las personas que no pueden pagarlo. Esta obligación incluye la de apoyar los programas existentes y la de contribuir positivamente a extenderlos y mejorarlos. (Énfasis suplido.)

Los tribunales hemos hecho valer esta exigencia ética. El abogado no puede eludirla reclamando perjuicio económico, ya que el Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, le requiere cumplir "aunque el así hacerlo conlleve sacrificios personales". Tampoco invocar que ejerce sólo como abogado en la práctica privada, pues como tal, su función tiene carácter público. *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 788 (1984). Ahora bien, puede rechazar una designación para la cual no se estime competente o capaz; el Canon 18 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, le impide asumir la representación cuando es consciente de que no puede prestar una labor idónea y competente. *In re Acosta Grubb*, 119 D.P.R. 595, 603 (1987); *In re Díaz Alonso, Jr.*, 115 D.P.R. 755, 762 (1984).

El planteamiento central del peticionario Ramos Acevedo y otros abogados comparecientes se basa en la *tesis absolutista* de que la obligación de proveer asistencia legal a los acusados indigentes recae *sólo* sobre el Estado. Argumentan que *cualquier desembolso o menoscabo del patrimonio* del abogado nombrado de oficio constituye un quebrantamiento a sus derechos constitucionales. Tal postura parte del supuesto de que el Estado incumple su obligación constitucional cada vez que un abogado representa a un indigente y, como consecuencia, tiene que realizar algún tipo de desembolso económico o deja de percibir ingresos adicionales. *En este extremo, no tienen razón.*

El interés del Estado de asegurar que los acusados insolventes tengan una adecuada representación legal no se erige como un impedimento para que los jueces,· por imperativos procesales, nombren abogados de oficio cuando por distintos motivos los integrantes de la Sociedad para la Asistencia Legal no están disponibles.

A poco reflexionemos, en el fondo estamos ante una obligación que vincula a dos (2) personas o entidades distintas: la del Estado, que nace del propio texto constitucional, y la de los abogados, que surge de la ley, de la ética y de la tradición. Por la génesis y naturaleza inherente del servicio, no podemos aplicar una teoría contractual. No se trata de una obligación bilateral, sinalagmática, en la que una parte pueda posponer el cumplimiento hasta tanto la otra cumpla. Son obligaciones independientes que nacen de fuentes distintas y en las que los beneficiados directamente no son ninguno de los obligados.

*Lamentablemente, como veremos, la mayoría del Tribunal desatiende esta importante distinción.* Al presente, numerosas circunstancias han incidido para cuestionar la tradicional visión de los abogados, en particular la facultad judicial para ordenarles asumir la representación de los acusados sin compensarlos.(6) Hasta hace poco, la mayoría de las jurisdicciones habían sostenido tales designaciones, independientemente de que no mediara retribución. En

---

(6) Es abundante la literatura sobre el tema: J.L. Anderson, *Court-Appointed Counsel: the Constitutionality of Uncompensated Conscription*, 3 Geo. J. Legal Ethics 503 (1990); C.D. Atwell, *Constitutional Challenges to Court Appointment: Increasing Recognition of an Unfair Burden*, 44 Sw. U. L.J. 1229 (1990); D.L. Shapiro, *The Enigma of the Lawyer's Duty to Serve*, 55 N.Y.U. L. Rev. 735 (1980). Véanse, además: A. Gilbert y W. Gorenfeld, *The Constitution Should Protect Everyone–Even Lawyers*, 12 Pepp. L. Rev. 75, 90 (1984); Comentarios, *Court Appointment of Attorneys in Civil Cases: the Constitutionality of Uncompensated Legal Assistance*, 81 Colum. L. Rev. 366 (1981); Comentarios, *The Uncompensated Appointed Counsel System: A Constitutional and Social Transgression*, 60 Ky. L.J. 710 (1972); Nota, *Indigent Criminal Defendant's Constitutional Right to Compensated Counsel*, 52 Cornell L.Q. 433 (1967).

Puerto Rico esa ha sido la norma; ¿existen razones constitucionales o de otra índole para variar o cualificarla?

## V

Durante varios siglos ha persistido y defendido la idea de la abogacía como una noble y digna profesión alejada de las prácticas e intereses comerciales. Esta situación, sin embargo, se ha transformado. "El capitalismo avanzado, con su correlativo crecimiento de la esfera administrativa, ha ido despojando a la abogacía de su aureola de noble profesión liberal. Fenómeno éste que se evidencia con la proletarización de buena parte de los abogados, bien por su integración al servicio público, bien por su condición de empleados a sueldo de empresas privadas o de 'socios' menores de otros abogados. Paralelamente se observa también un auge en el ejercicio en grupo de la profesión —las llamadas sociedades de abogados— que en ciertos casos operan con un esquema similar al de una moderna empresa comercial." L.R. Rivera, *Responsabilidad Civil de los Abogados* (inédito), 1992.

Como muy bien apunta en su alegato la Facultad de Derecho de la Universidad de Puerto Rico, varias circunstancias han afectado el desempeño de los abogados en la esfera específica del derecho penal. Veamos. (A) *Ampliación del derecho a abogado*: hoy, la representación legal adecuada se extiende a múltiples etapas del proceso y resulta más oneroso brindarla sin recibir compensación. (B) *Complejidad del procedimiento*: nueva legislación, múltiples enmiendas y numerosos cambios doctrinales han ensanchado los horizontes del derecho procesal penal. Ante esa complejidad, el abogado tiene que dedicarle más tiempo a la preparación del caso. (C) *Especialización*: lo expuesto ha dado paso al fenómeno del *abogado criminalista*. (D) *Comercialización*: la percepción pública de una profesión divorciada de las prácticas comerciales o

de negocio está desapareciendo, en particular, desde que se legitimó la publicidad y los anuncios de abogados en *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977). Además, el aumento de abogados ha generado una competencia poco distante de la comercial; ello naturalmente provoca oposición a los nombramientos de oficio. (E) *Nuevas doctrinas científicas y tendencias judiciales*: el reputado profesor David L. Shapiro, en su artículo *The Enigma of the Lawyer's Duty to Serve*, 55 N.Y.U. L. Rev. 735 (1980), ha contribuido notablemente al replanteamiento de la norma tradicional del abogado como funcionario del tribunal, posición que ha encontrado eco en algunos tribunales. (F) *Aumento en el crimen y la pobreza*: es materia de conocimiento judicial el incremento de los acusados indigentes y las asignaciones de oficio. (G) *Insuficiencia de fondos*: se nota una merma de asignaciones de fondos y estancamiento de programas de asistencia legal.

## VI

Frente a estos factores, cinco (5) objeciones de índole constitucional se aducen contra los nombramientos de oficio sin compensación: (1) privación de propiedad sin justa compensación o el debido procedimiento de ley en términos sustantivos; (2) *desigual protección de las leyes porque impone a los abogados una carga no exigida a otras personas o porque algunos abogados no tienen que sobrellevarla*; (3) servidumbre involuntaria; (4) infracción al derecho de asistencia de abogado garantizado por la sexta enmienda de la Constitución federal, y (5) prestación de servicios involuntarios en violación a la libertad de conciencia. Examinémoslas.

Según indicado, hasta reciente, numerosas jurisdicciones en Estados Unidos consideraban el nombramiento de oficio —con muy poca o ninguna compensación— constitucional. Véase *Williamson v. Vardeman*, 674 F.2d

1211, 1214–1215 (8vo Cir.1982), y casos allí citados. En las últimas dos (2) décadas, sin embargo, cobró auge una tendencia contraria, apoyada en las nuevas circunstancias que confronta la profesión. Algunos tribunales han aceptado estos cambios, pero han sostenido los ataques constitucionales, sobre todo aquellos basados en las cláusulas de debido procedimiento de ley y justa compensación de la Constitución federal. *DeLisio v. Alaska Superior Court*, 740 P.2d 437, 439–441 (Alaska 1987); *State ex rel. Stephan v. Smith*, 747 P.2d 816, 837–842 (1987).

Reconocidamente, la cláusula de justa compensación y la del debido procedimiento protegen la propiedad privada contra una incautación o perjuicio arbitrario o sin compensación. Art. II, Secs. 7 y 9, Const. E.L.A., L.P.R.A., Tomo 1; Emdas. V y XIV, Const. EE. UU., L.P.R.A., Tomo 1; *The Richards Group v. Junta de Planificación*, 108 D.P.R. 23 (1978); *E.L.A. v. Márquez*, 93 D.P.R. 393 (1966); *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 239–242 (1984); *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 481–486 y 506 (1987). En recta lógica adjudicativa, esa salvaguarda nos obliga primero a resolver si los servicios que rinde un abogado son "propiedad" dentro del significado de las referidas cláusulas. *State ex rel. Stephan v. Smith*, supra, y casos allí citados.

El *trabajo*, en su acepción histórica, es la manera más elemental e inalienable de cualquier descripción del derecho propietario. En el abogado se materializa con la inversión de su tiempo y esfuerzo intelectual; es un bien intangible. *Nassar Rizek v. Hernández*, 123 D.P.R. 360 (1989). Por otro lado, el gasto para preparar una defensa adecuada es tangible. No es difícil concluir que las disposiciones constitucionales aludidas resguardan la propiedad tangible e intangible.([7]) Ello explica, específicamente, por

---

([7]) Aunque en otros contextos, véanse: *Board of Regents v. Roth*, 408 U.S. 564 (1972), derecho a un empleo; *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), secretos comerciales. En el ámbito contributivo, en Puerto Rico, sobre conocimiento

qué los abogados y otros profesionales son acreedores a que los procedimientos de admisión y disciplinarios estén en "armonía" con el debido procedimiento de ley. *Santiago v. Trib. Exam. de Médicos*, 118 D.P.R. 1 (1986); *Román v. Trib. Exam. de Médicos*, 116 D.P.R. 71 (1985); *In re Pagán*, 71 D.P.R. 761, 763 (1950); *Withrow v. Larkin*, 421 U.S. 35, 46 (1975); *In re Buffalo*, 390 U.S. 544, 550 (1968). En resumen, partimos de la premisa de que los servicios de un abogado constituyen "propiedad" protegida constitucionalmente. *De Lisio v. Alaska*, supra, pág. 440; J.L. Anderson, *Court–Appointed Counsel: the Constitutionality of Uncompensated Conscription*, 3 Geo. J. Legal Ethics 503, 520–521 (1990); D.L. Shapiro, *The Enigma of the Lawyer's Duty to Serve*, 55 N.Y.U. L. Rev. 735, 771 (1980).

Aclarado este aspecto, veamos si la privación de esa propiedad está relacionada *racionalmente* con un fin o interés legítimo del Estado o si, por el contrario, estamos ante una acción arbitraria o caprichosa gubernamental. Además, veremos si al amparo de la cláusula de justa compensación —suponiendo que la privación sea racional— obligar al abogado a rendir unos servicios conlleva e impone una carga tan onerosa que automáticamente requiera una justa compensación.

## VII

*La validez de una designación sin compensación conforme la cláusula de debido procedimiento en su modalidad sustantiva, depende de las características del sistema.* Bajo este enfoque, en *State ex rel. Stephan v. Smith*, supra, el Tribunal Supremo del estado de Kansas estimó *racional* requerir a los abogados que donaran tiempo razonable. *Ahora bien, declaró caprichoso, arbitrario y nulo el sistema*

---

técnico especial (*know-how*), examínese *Caribe Crown Corp. v. Srio. de Hacienda*, 108 D.P.R. 796, 804–805 (1979).

*local que imponía una carga excesivamente onerosa sobre un pegueño grupo de abogados.*

Con mayor rigurosidad, otros tribunales han invalidado el sistema aun cuando la carga haya sido distribuida equitativamente entre todos. Razonan que no es legítimo obligar solamente a los proveedores de los servicios sobrellevar todo el costo de representar a los indigentes. *Webb v. Baird*, 6 Ind. 13, 17 (1854); *Cunningham v. Superior Court*, 222 Cal. Rptr. 854, 862 (Cal. App. 2, 1986).

*No compartimos estos enfoques.* El criterio rector del la cláusula del debido procedimiento en el área de reglamentación económica es la *racionalidad* de la acción del Estado: que no sea irrazonable, arbitraria o caprichosa. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 80 (1983). *Cf. M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319, 334 (1987); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533, 538–539 (1984). Por ende, no podemos concluir, ab initio, que todo tipo de esquema sea inválido, independientemente de sus efectos y diseño. Es decir, estimamos racional exigir una cantidad *limitada* de servicios profesionales *sin* compensación. La clave estriba en que "[l]a buena marcha del proceso judicial del país es *responsabilidad ineludible de todo* miembro de la profesión legal". (Énfasis suplido.) *In re Vélez Báez*, 128 D.P.R. 509 (1991). *A fin de cuentas, para poder ejercer la profesión, en alguna medida todo abogado depende que integralmente el sistema judicial funcione de manera adecuada.*

"[P]ara un abogado mantener el sistema legal es tan importante como para un chofer de camión mantener el sistema de carreteras. Ello incluye una representación legal adecuada para todas las partes. 'El sistema de litigación, por sí mismo', ha dicho un Tribunal, 'algunas veces no puede operar para producir resultados justos a menos que todas las partes en disputa estén representadas competentemente'. Por lo tanto, requerir a los abogados que contribuyan al funcionamiento del sistema jurídico es tan racional como la contribución fiscal especial impuesta en los choferes de camiones." (Traducción nuestra.) An-

derson, *op. cit.*, pág. 522, citando a *Ex parte Dibble*, 310 S.E.2d 440, 442 (S.C. App. 1983).

Además, en nuestra sociedad numerosas actividades están sujetas a cargas especiales cuando se determina que existe un nexo suficiente entre la actividad y la condición que se le impone. *Arenas Procesadas, Inc. v. E.L.A.*, 132 D.P.R. 593 (1993); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834–837 (1987). Por otro lado, podemos razonablemente suponer que el costo que representa el rendir servicios legales sin compensación, eventualmente será sustancialmente transferido a sus consumidores. *Requerirlo a todos, de su faz, es el mecanismo racional para distribuir el costo del sistema judicial entre los protagonistas principales que lo usan y usufructan.*

En Puerto Rico no existe una disposición estatutaria que establezca un sistema de nombramiento de abogado de oficio sin compensación.([8]) Los jueces recurren al nombra-

---

([8]) El abanico de posibles esquemas compensatorios es amplio. A fines de 1991, los siguientes estados habían aprobado legislación al efecto: Alabama (Ala. Code Sec. 15.12.6 (1990)); Alaska (Alaska Stat. Sec. 18.85.100 (1991)); Arkansas (Ark. Code Ann. Sec. 16.87.106 (1991)); California (Cal. Penal Code Sec. 987.3 (1991)); Connecticut (1989 Conn. Adv. Legis Serv. 326; Public Act No. 89-326 (1989)); Delaware (Del. Code Ann. Tit. 29 Sec. 4605 (1991)); District of Columbia (1991 D.C. Stat. Sec. 11-2605); Florida (Fla. Stat. Sec. 925.036 (1990)); Georgia (Ga. Code Ann. Sec. 17.12.5 (1991)); Iowa (Iowa Code Ann. Sec. 815.1 (1991)); Lousiana (1990 La. Adv. Leg. Serv. 1044, La. Rev. Stat. Sec. 15.144); Maine (Me. Rev. Stat. Tit. 15 Sec. 810 (1990)); Massachusetts (Mass. Ann. Laws Sec. 55 (1991)); Mississippi (Miss. Code Ann. Sec. 99.15.17 (1972 y revisado en 1990)); Montana (Mont. Code Ann. Sec. 46.8.201 (1991)); Nebraska (Neb. R. Stat. Sec. 29.3004 (1990)); Nevada (Nev. Adv. Leg. Serv. 44 Sec. 7.125); New Hampshire (N.H. Rev. Stat. Ann. Sec. 604-A:4 (1990)); New Jersey (N.J. Stat. Sec. 2A.163.1 (1990)); New York (N.Y. Laws Sec. 722 (1991); North Carolina (1991 N.C. Adv. Leg. Serv. 689); Ohio (Oh. Rev. Code Ann. Sec. 2941.51 (1991)); South Dakota (S.D. Codified Laws Ann. Sec. 26.7A.31 (1991)); Tennessee (Tenn. Code Ann. Sec. 40.14.207 (1991)); Texas (Tex. Adv. Leg. Serv. Cl. 719 (1991)); Virginia (Va. Code Ann. Sec. 19.2-163 (1991)); West Virginia (W. Va. Code Sec. 29.21.14 (1991)); Wisconsin (Wis. Stat. Sec. 978.045 (1990)); Wyoming (Wyo. Stat. Sec. 7.6.109 (1991)).

"[L]os abogados deben designarse de acuerdo al número de horas que han dedicado a representar *pro bono*. Rotar las asignaciones a base de las horas prestadas, en lugar del número de casos tomados, distribuiría la carga más balanceadamente y eliminaría todo incentivo de reducir el servicio. Más aún, el plan debe proveer más trabajo para los abogados de todas especialidades, para evitar concentrar la carga en

miento ad hoc según surgen las necesidades en cada caso. Incuestionablemente la ausencia de un sistema con criterios claros crea el riesgo de que se susciten situaciones de arbitrariedad o capricho, y que los nombramientos recaigan en un grupo limitado de abogados.

Sin embargo, según expuesto, ello no macula automáticamente tales designaciones. *En definitiva, es obvio que la cláusula de debido procedimiento de ley no se activa si se establece un sistema justo y equitativo para el nombramiento de abogados de oficio sin compensación, que recaiga sobre toda la profesión. Ahora bien, sin tal sistema, la forma ad hoc en la cual se hacen actualmente los nombramientos es arbitraria y caprichosa, y, por ende, inválida. La opinión mayoritaria, aunque pretenda, no logra subsanar estas deficiencias constitucionales; ciertamente es trunca.*

## VIII

El concepto jurídico *incautación (taking)* implica evaluar la acción gubernamental en cuestión y su grado de interferencia real con los derechos de propiedad privada. *Arenas Procesadas Inc. v. E.L.A.*, supra; *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 130 (1978); *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 415 (1922). El Tribunal Supremo federal ha sostenido que "la proposición para que las personas puedan establecer una 'incautación' demostrando sencillamente que se les ha negado a ellos la habilidad de explotar un interés propietario que creían disponible para desarrollar es simplemente insostenible". (Traducción nuestra.) *Penn Central Transp. Co. v. New York City*, supra.

Como indica F. Michelman en *Property, Utility, and*

---

un subgrupo del foro. Los abogados que aleguen que no pueden prestar un servicio competente deben ser dispensados pagando un estipendio, pero sólo cuando sea absolutamente necesario. Véase *Model Rule of Professional Conduct*, Rule 6.2 (razones válidas para renunciar). El pago debe usarse para contratar un sustituto." (Traducción nuestra.) Anderson, *op. cit.*, pág. 521 esc. 105.

*Fairness: Commentaries on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L. Rev. 1165 (1967), luego de analizar numerosa jurisprudencia, uno de los siguientes cuatro factores es generalmente decisivo para determinar si la acción realizada por el Gobierno exige justa compensación:

> (1) si el público o sus agentes ha usado físicamente u ocupado algo perteneciente al reclamante; (2) el tamaño del perjuicio sufrido por el reclamante o el grado que se ha menoscabado su propiedad afectada; (3) si la pérdida del reclamante es o no superada por la ganancia concomitante del público; (4) si el reclamante ha sufrido otra pérdida aparte de la restricción a su libertad de realizar alguna actividad considerada perjudicial a otras personas. (Traducción nuestra.) Michelman, *supra*, pág. 1184. Véase, además, 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 15.12 (1986).

A la luz de estos factores, es ineludible concluir que el nombramiento de oficio sin compensación constituye una apropiación de los servicios del abogado, pero de ordinario, como carga atenuada y salvo circunstancias extraordinarias, no requiere retribución. La sola encomienda resulta insuficiente para justificar *siempre* el pago de justa compensación, en contraste a cuando se demuestra un impacto claramente oneroso que supera los beneficios derivables. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 596 (1962).[9] Nos explicamos.

---

[9] Otro enfoque supone que no se ha privado al abogado de propiedad alguna. Rendir servicios sin compensación es una condición tácita de la licencia para ejercer la profesión y, por ende, el abogado al aceptarla renuncia a cualquier interés propietario sobre dichos servicios. Anderson, *op. cit.*, pág. 523; *United States v. Dillon*, 346 F.2d 633, 635 (9no Cir. 1965); *State v. Ruiz*, 602 S.W.2d 625 (1980).

Los siguientes casos resuelven que *existe* una incautación inconstitucional: *State ex rel. Stephan v. Smith*, supra; *State v. Lynch*, 796 P.2d 1150 (Okla. 1990); *State v. Robinson*, 465 A.2d 1214 (1983); *In interest of D.B.*, 385 So. 2d 83 (1980); *Bradshaw v. Ball*, 487 S.W.2d 294 (1972); *State v. Green*, 470 S.W.2d 571 (1971); *Kovarik v. County of Banner*, 224 N.W.2d 761 (1975); *Bedford v. Salt Lake County*, 447 P.2d 193 (1968); *State v. McKenney*, 582 P.2d 573 (Wash. 1978). En contrario: *Sparks v. Parker*, 368 So. 2d 528 (1979); *State v. Rush*, 217 A.2d 441 (1966); *Abodeely v. County of Worcester*, 227 N.E.2d 486 (1967); *United States v. Dillon*, supra; *Warner v. Commonwealth*, supra.

La jurisprudencia reciente y el enfoque en *Penn Central Transp. Co. v. New York City*, supra, coinciden con esta doctrina, pues asigna importancia decisoria a la manera en que se caracteriza la acción gubernamental. Así, de un lado, el reclutamiento obligatorio del abogado podría considerarse análogo a una apropiación física de sus servicios. No se trataría simplemente de una reglamentación que meramente disminuya la rentabilidad de su práctica profesional, *sino una transferencia directa de la propiedad del abogado al indigente*. Desde esta óptica, como confiscación física, estaríamos ante un caso que indiscutiblemente requeriría justa compensación. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). Véase, además, Atwell, *op. cit.*, págs. 1257–1259.

Por otro lado, *Penn Central Transp. Co. v. New York City*, supra, también admite que la acción gubernamental pudiera interpretarse como que sólo disminuye el valor o la rentabilidad de la práctica profesional del abogado. Requerirle servicios profesionales sin compensación, por sí solo y sin demostrar circunstancias extraordinarias, no conllevaría justa compensación. Para justificarla, tendría que demostrar que la interferencia con los derechos propietarios son de tal magnitud que frustran sus expectativas económicas, impidiéndole obtener un rendimiento razonable del ejercicio de su profesión.

La jurisprudencia estatal que se hace eco de esta postura es significativa. *State ex rel. Stephan v. Smith*, supra. Estamos ante una *incautación* cuando los servicios son *un gravamen irrazonable* porque median circunstancias extraordinarias. Es irrazonable si le impide al abogado continuar ejerciendo su profesión, se ve precisado a abandonarla por un período extenso al tener que dedicarle una porción significativa de su tiempo, cuando se le requiere que se mude de lugar, cuando se le exige que cubra los costos de la litigación de su propio peculio durante un proceso criminal prolongado o cuando el abogado sufre unas

pérdidas significativas debido a que tiene que continuar sufragando sus gastos de oficina mientras los rinde. Véanse: *People v. Randolph*, 219 N.E.2d 337, 340 (1966); *State ex rel. Stephan v. Smith*, supra; *Daines v. Markoff*, 555 P.2d 490, 492–493 (Nev. 1976); *Bias v. State*, 568 P.2d 1269, 1272 (Okla. 1977); *State ex. rel. Partain v. Oakley*, 227 S.E.2d 314 (1976); *White v. Board of County Com'rs*, 537 So. 2d 1376, 1379 (1989).

Varios casos han resuelto que el deber ético de los abogados de rendir servicios gratuitos a los acusados indigentes impide la aplicación de la disposición constitucional sobre uso público de la propiedad privada sin compensación; en realidad no hay una incautación (*taking*). *Hurtado v. United States*, 410 U.S. 578 (1973); *U.S. v. Dillon*, 346 F.2d 633 (9no Cir. 1965); *State v. Rush*, 217 A.2d 441 (1966); *Williamson v. Vardeman*, supra. El último pronunciamiento del Tribunal Supremo federal fue *Mallard v. U.S. District Court*, 490 U.S. 296 (1989). Allí una mayoría de cinco (5) jueces se expresó a favor de la *norma tradicional* que valida la práctica de los abogados de oficio nombrados por el tribunal *sin* recibir ningún tipo de compensación económica.

## IX

Sin embargo, el peticionario Ramos Acevedo alega que su designación no es aislada, sino repetitiva. Ciertamente, una sola designación de oficio, o al menos de naturaleza esporádica, no necesariamente conlleva una interferencia "irrazonable" con el derecho de propiedad de los abogados. Ahora bien, la necesidad de incurrir en gastos personales (*out of pocket expenses*), para una defensa adecuada, podría ser una interferencia irrazonable en algunos casos, pero en otros insignificantes. "[A]unque puede ser constitucional imponer a todo abogado una carga modesta de servicio público, es manifiestamente irrazonable requerir a un nú-

mero pequeño (úsualmente abogados especialistas criminalistas) invertir mucho tiempo amenazando su práctica, mientras otros no invierten nada. *Si se va a mantener un sistema, debe desarrollarse uno de justa distribución.*" (Traducción nuestra y énfasis suplido.) Anderson, *op. cit.*, pág. 528.

Según indicáramos, no existen normas o reglamentos en nuestra jurisdicción que guíen la discreción de los jueces al hacer designaciones de oficio. *La elaboración de dicho sistema es tarea principal e inherente del Poder Judicial, compartida con la Asamblea Legislativa. Aunque la mayoría lo rechace, superar la inconstitucionalidad de la práctica conlleva configurar una solución permanente. Mientras tanto, es un imperativo constitucional decisorio pronunciarnos sobre los criterios básicos que deben concurrir para que estos nombramientos sean compatibles con las limitaciones constitucionales.* Además, ante la realidad de que una designación de oficio pudiera conllevar una considerable inversión de tiempo y esfuerzos del abogado defensor, es necesario también establecer un procedimiento para compensarlo justamente en situaciones extraordinarias.

## X

Como preludio a esa tarea, anotamos que la impugnación a la designación compulsoria gratuita bajo la igual protección de las leyes se plantea en los siguientes términos: ¿por qué los abogados, o un grupo de éstos, deben cargar con la responsabilidad de proveer los servicios no compensados? En el fondo se aduce discrimen o desigualdad en la distribución de la carga económica.

Según expuesto, tratándose de una situación en la esfera de la reglamentación económica, sólo es inconstitucional la actuación caprichosa o arbitraria. Reafirmamos una vez más el escrutinio tradicional mínimo como criterio para atender la impugnación de clasificaciones económicas

bajo la igual protección de las leyes. La actuación guberna-
mental se sostiene si razonablemente puede concebirse
una situación que justifique su clasificación. Quien la im-
pugna tiene el peso de establecer que es claramente arbi-
traria y que no puede detectarse nexo racional alguno.

No es difícil imaginar una razón que justifique la desig-
nación de cierto abogado para que asuma la representación
de un acusado indigente que carezca de uno. Bajo la doc-
trina vigente de la igual protección de las leyes no es me-
ritorio un planteamiento de compensación por parte del
abogado *así designado*. Acogerlo "ignora la autoridad de la
Corte Suprema en reglamentación discriminatoria" (An-
derson, *op. cit.*, pág. 519), esto es, que "sólo es discrimina-
ción odiosa (*invidious*), el estatuto totalmente arbitrario,
que no está en armonía con la Décimocuarta enmienda'.
*City of New Orleans v. Dukes*, 427 U.S. 297, 303–304
(1976)". (Traducción nuestra.) Íd.

El peticionario Ramos Acevedo invoca, además, la pro-
hibición de toda forma de servidumbre involuntaria. Art.
II, Sec. 12, Const. E.L.A., L.P.R.A., Tomo 1. Planteamientos
similares, bajo las disposiciones análogas de la Enmda.
XIII a la Constitución federal, han sido rechazados categó-
ricamente por tribunales y comentaristas.([10]) *Hurtado v.
United States*, supra, pág. 578; *Selective Draft Law Cases*,
245 U.S. 366 (1918); *Butler v. Perry*, 240 U.S. 328 (1916);
*Edwards v. United States*, 103 U.S. 471 (1880). Las deci-
siones son prácticamente unánimes: no puede sostenerse
que servir gratuitamente a un acusado indigente, aunque
sea por orden de un tribunal, constituya servidumbre
involuntaria. Dicha prohibición nada tiene que ver con la
obligación de un abogado de ofrecer servicios legales a los
indigentes. La permanencia de esa prohibición en el texto
constitucional se hizo en atención no tan sólo por el valor

---

([10]) Anderson, *op. cit.*, págs. 514–516; C.D. Atwel, *Constitutional Challenges to
Court Appointment: Increasing Recognition of Unfair Burden*, 44 Sw. L.J. 1229,
1251–1252 (1990).

solemne de ésta, sino también "por las formas indirectas y a veces sutiles que a ella puede conducir de hecho las varias posibilidades del trabajo forzado o involuntario". 4 Diario de Sesiones de la Convención Constituyente, 2571–2572 (1951). Una vez establecida la existencia de un deber, es claro que su cumplimiento no constituye una manera indirecta de esclavitud.

## XI

A la luz del análisis que precede, no se cuestiona que nuestra Constitución y que la Enmda. VI federal, en cuanto exige que la asistencia de abogado sea adecuada o efectiva, permite *rechazar* la designación si el abogado estima que no tiene la competencia necesaria para cumplirla. Ello está en armonía con el Canon 18 del Código de Ética Profesional, 4 L.P.R.A. Ap. II, que considera impropio asumir una representación profesional si se es "consciente de que no puede rendir una labor idónea competente y no puede prepararse adecuadamente sin que ello apareje gastos o demoras irrazonables a su cliente o a la administración de la justicia". Canon 18 del Código de Ética Profesional, *supra.*

Distinto al argumento del peticionario Ramos Acevedo, la buena calidad en la defensa no es pertinente frente al planteamiento de compensación: "no existe razón para creer que el abogado no retribuido falla en proveer representación adecuada al indigente." (Traducción nuestra.) Anderson, *op. cit.*, pág. 517. El estudio más reciente sobre el particular tiende así a corroborarlo. *Indigent Defenders*, Nat. Center for State Courts, mayo 1992; *Makemson v. Martin County*, 491 So. 2d 1109 (1986).

En lo que respecta a las entidades principales en Puerto Rico —Sociedad para Asistencia Legal y Corporación de Servicios Legales, Inc.— ya en el pasado hemos reconocido "[l]a extraordinaria labor que llevan a cabo [sus] abogados

...". *Pueblo v. Vega, Jiménez*, 121 D.P.R. 282, 292 (1988). Véase *Vega v. Luna Torres*, supra.

## XII

En principio, la defensa de indigentes podría estar bajo la sombrilla protectora de la Primera Enmienda de la Constitución federal, esto es, la asociación y la membresía involuntaria o contra la asociación compulsoria en determinadas causas.

La sola exigencia de compensación —único reclamo ante nuestra consideración— no es suficiente para anular la obligación de los cánones. No obstante, nada impide al abogado invocar válidamente cuestiones de conciencia o de creencias para negarse a asumir determinada representación. El abogado que de *buena fe* no acepta una designación por razones de conciencia estará protegido. La Regla 6.2 de las Reglas Modelo de Conducta Profesional de la A.B.A. provee para ello. *Cf. Keller v. State Bar of California*, 496 U.S. 1 (1990); *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977); *Lathrop v. Donohue*, 367 U.S. 820 (1961); *Colegio de Abogados de P.R. v. Schneider*, 112 D.P.R. 540 (1982); *Colegio de Abogados v. Schneider*, 117 D.P.R. 504 (1986); *Schneider v. Colegio de Abogados de Puerto Rico*, 917 F.2d 620 (1er Cir. 1990).

## XIII

*Aclarados estos extremos, distinto a la mayoría, la adjudicación del presente recurso pone de manifiesto la necesidad imposponible de trazar nuevos horizontes e insuflarle vida a la función social del abogado en el Puerto Rico contemporáneo, mediante la adopción de un sistema integral, abarcador y compulsorio que distribuya justa y equitativamente el deber ético de proveer servicios legales gratuitos a los indigentes.* A fin de cuentas, el abogado no es un simple

observador aislado de la psicogénesis y dinámica decisoria; en muchos extremos es "protagonista y coadyuvante del diario judicial. Su persona es una extensión básica de los tribunales". *In re Cardona Álvarez*, 116 D.P.R. 895, 903 (1986). Dicha obligación, según indicado, emana del Canon 1 del Código de Ética Profesional, *supra*, esto es, del abogado como auxiliar del tribunal "luchar. continuamente para garantizar que toda persona tenga acceso a la representación capacitada, íntegra, diligente de la profesión legal".

La tarea es compleja. Anticipamos que esta posición —producto de un análisis reflexivo de varios meses— naturalmente generará objeciones y críticas —sanas y constructivas— entre algunos miembros del foro puertorriqueño; *ningún sistema es perfecto.* Sin embargo, cualesquiera fallas iniciales serían superadas prontamente sobre la marcha. Como tantas otras empresas, la experiencia sería aleccionadora y nos permitiría, a la larga, que el esquema final y servicios fuera cualitativa y cuantitativamente el más depurado y los mejores.

En consecuencia, al amparo de nuestra facultad inherente[11] de reglamentar la profesión de abogado en sus distintos aspectos, emitiríamos los siguientes pronunciamientos:

*Primero*, todo abogado prestará un mínimo de horas anuales de "servicios legales gratuitos a indigentes". Dos (2) métodos se han propuesto para cuantificar este tipo de

---

[11] En la historia de este Foro, antes y después de la Constitución, hemos reafirmado invariablemente esta facultad. Véanse: *García O'Neill v. Cruz*, 126 D.P.R. 518 (1990); *K-Mart Corp. v. Walgreens of P. R., Inc.*, 121 D.P.R. 633, 637 (1988); *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778 (1984); *In re Rojas Lugo*, 114 D.P.R. 687 (1983); *In re Roldán González*, 113 D.P.R. 238 (1982); *In re Ríos*, 112 D.P.R. 353 (1982); *Warner Lambert v. F.S.E.*, 111 D.P.R. 842 (1982); *In re Álvarez Crespo*, 110 D.P.R. 624 (1981); *In re Liceaga*, 82 D.P.R. 252 (1961); *In re Pagán*, supra, pág. 763; *In re Abella*, 67 D.P.R. 229, 238 (1947); *In re González Blanes*, 65 D.P.R. 381, 390–391 (1945); *In re Bosch*, 65 D.P.R. 248 (1944); *Guerrero v. Tribunal de Apelación*, 60 D.P.R. 241, 247–252 (1942); *Ex parte Jiménez*, 55 D.P.R. 54 (1939); *In re Tormes*, 30 D.P.R. 267, 268 (1922).

servicio. El *primero*, a base del número de asuntos que el abogado acepte y termine durante el año. Tiene la virtud de asegurar que un mismo abogado represente al cliente a través de todo el proceso. Sin embargo, como desventaja, se señala que podría estimular a que los abogados, con el propósito de evadir su responsabilidad, terminen prematuramente los pleitos, produciéndose un fracaso a la justicia. Además, dificulta la distribución equitativa, toda vez que la gama de asuntos legales es amplia, y algunos abogados atenderían los breves o sencillos, mientras que otros intervendrían en unos sumamente complejos.

El otro método mide la obligación por horas de servicio. Su virtud es la sencillez. Permite una distribución más equitativa y que el abogado pueda fácilmente armonizar y acoplar el servicio a su calendario.[12] La mayoría de las propuestas lo han adoptado.

Muchas propuestas, aunque sobre bases voluntarias, sugieren que se preste un número *mínimo* de horas que oscile entre veinte (20) y cincuenta (50).[13] Con el fin de permitir que los abogados puedan *terminar* encomiendas particulares, que excedan las horas anuales requeridas en un (1) año en particular, estimamos conveniente que se permita prorratear a años subsiguientes la labor rendida en exceso de la obligación. Se autorizaría, con mayor énfasis, en servicios a prestarse en áreas del derecho penal y

---

[12] J.R. deSteiguer, *Mandatory Pro Bono: The Path to Equal Justice*, 16 (Núm. 2) Pepperdine L. Rev. 378–379 (1988).

[13] La American Bar Association propuso, como aspiración ética, la inversión anual de por lo menos cincuenta (50) horas de servicios legales *pro bono*. 61 L.W. 1117.

En Idaho y Wisconsin se recomendaron veinticinco (25) horas. *Resolution 91–11 Participation in Pro Bono Activities*, The Advocate, enero 1992; *Wisconsin Lawyer*, junio 1989. Entre tanto, la propuesta de Florida es veinte (20) horas. *Florida's New Pro Bono Program*, ABA Journal, abril 1992. Arizona hizo una *propuesta* similar a la de la ABA, es decir, un mínimo de cincuenta (50) horas anuales. *Why is There a Debate Over Mandatory Pro Bono Work?*, Arizona Attorney, mayo 1990. Igual número han sido sugeridas en Kentucky y Texas. Kentucky Bench and Bar, Spring 1992; Texas Bar Journal, septiembre 1992.

civil que presentan las necesidades más apremiantes de los indigentes.([14])

*Segundo*, para cuantificar la compensación *en aquellos casos que procedan*, el abogado deberá escrupulosamente llevar un récord del tiempo invertido y la naturaleza de sus gestiones. Al concluir la gestión someterá, bajo juramento, un *memorando de honorarios* al tribunal. Evaluada su razonabilidad, a la luz de los autos originales y demás factores pertinentes, el tribunal lo aprobará para su correspondiente pago. El tribunal tendrá la facultad para modificar o eliminar cualquier partida que resulte irrazonable o improcedente.

*Tercero*, el concepto básico decisorio será la *razonabilidad* en interacción con los destinatarios de los servicios: los pobres. No podemos equiparar estas compensaciones con los honorarios que se cobran en la práctica privada. Hacerlo desnaturalizaría en parte el substrato ético de esta obligación. Después de todo, esta remuneración tiene que estar "dentro de unos límites que no rebasen la línea imaginaria que separa los honorarios altos perfectamente lícitos [en otras situaciones] y los que operan como opresión de una clase privilegiada contra el consumidor de servicios". *López de Victoria v. Rodríguez*, 113 D.P.R. 265, 268 (1982).

A tal efecto, un estudio realizado hace algún tiempo por *Servicios Legales de Puerto Rico, Inc.* reveló que el promedio de la tarifa de honorarios prevalecientes en el país era de cincuenta dólares ($50) la hora y setenta dólares ($70) por servicios especializados en las distintas áreas del

---

([14]) La encomienda del Canon 1 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, es clara. Sin ambages, identifica como 'deberes específicos de todo abogado: laborar por garantizar el acceso a representación legal; prestar servicios legales a indigentes, y luchar por el establecimiento de sistemas para suministrar servicios legales a personas que no pueden pagar por ellos.

Ello nos permite obviar el debate que existe en algunas jurisdicciones de los Estados Unidos en torno a qué servicios, en beneficio del bienestar público, debe rendir el abogado como aspiración u obligación ética. Véanse: J.S. Génova, *Pro Bono Pauperis?*, 65 (Núm. 2) New York State Bar Journal 30 (febrero 1993); *ABA Endorses 50–Hour Pro Bono Minimum, Oposes Statutory Renoval of U.S. Judges*, 61 U.S. Q.W. 2479, 2489 (1993); *Mandatory Pro Bono*, supra, págs. 375–378.

derecho. Esta corporación utilizó esas cifras para establecer las tarifas a pagarse a los abogados en la práctica privada que prestan sus servicios a través del Programa de Práctica Compensada (P.P.C.) que ofrece. *Se satisfacen los servicios legales a razón de veinticinco dólares ($25) la hora, y el panel de áreas especializadas, a treinta y cinco dólares ($35).* Como punto de partida, para inmediata implantación, sujeto a revisión futura, consideramos *razonable una tarifa de treinta dólares ($30) fuera del tribunal; cincuenta dólares ($50) en el tribunal.* De igual modo, en aquellos asuntos aplicables, consideramos razonable las Tablas de Compensación del Programa de Práctica Compensada de Servicios Legales de P.R., Inc.

*Cuarto*, en circunstancias meritorias —como por excepción— el abogado podrá optar por satisfacer esta obligación mediante una aportación económica. Su determinación final se formulará utilizándose criterios objetivos.

Como corolario, el producto de la multiplicación de las horas de servicio pro bono que debe servir el abogado bajo estas tarifas, representará la aportación económica necesaria para satisfacer esta obligación ética.

Estará disponible, además, su cumplimiento en forma mixta. Si un abogado, de buena fe trata de prestar sus servicios, pero no le es posible cumplir con la totalidad de horas requeridas, se le permitirá completarla mediante el pago de las horas no trabajadas según la tarifa antes establecida.

*Quinto*, se relevará al abogado de cumplir con esta exigencia ética cuando medie una (1) de las causas siguientes: incapacidad, retiro, incompetencia profesional, razones de conciencia,[15] pertenecer a la Judicatura o estar obligado por los cánones de ética judicial, ser funcionario público, empleado del Gobierno, municipios u otras agencias guber-

---

[15] La incompetencia profesional y las razones de conciencia eximen de la obligación de aceptar una encomienda particular, mas no el deber general de prestar las horas de servicios requeridas o de hacer la correspondiente aportación económica.

namentales o corporaciones públicas, impedidos de practicar la profesión, no residir en Puerto Rico y otras causas excepcionales, permanentes o temporales, tales como dificultades económicas, enfermedad y otras.[16]

*Sexto*, el deber aquí reconocido comprende los servicios directos y aquéllos a entidades que suministran servicios legales a los menesterosos. Se extiende al área de lo *penal* en causas criminales en que no pueda intervenir, o proveer servicios, la Sociedad de Asistencia Legal. Incluye, claro está, la práctica apelativa criminal.

En cuanto al área de lo civil, servirá de punto de partida el *Programa de Envolvimiento de los Abogados en la Práctica Privada; Plan de 1993* de Servicios Legales de Puerto Rico, Inc., a saber, servicios prioritarios en educación; vivienda pública y privada; beneficios públicos mantenimiento de ingresos; salud y seguros médicos; relaciones de familia; empleo; consumidores, servicios públicos, finanzas; derechos individuales; calidad ambiental y condición física de la comunidad, y menores juvenil.

*Séptimo*, para la determinación de quienes son indigentes, se utilizarán los criterios vigentes tradicionales establecidos por los tribunales (*forma pauperis*), y las cualificaciones de la Sociedad para Asistencia Legal, Servicios Legales de Puerto Rico, Inc. y las Clínicas de Asistencia Legal de las Universidades.

Y *octavo*, reafirmamos que "[e]l hecho de que el abogado reciba retribuciones mínimas, o ninguna como puede ocurrir en algunos casos, no es excusa que justifique su falta de diligencia en la tramitación de un caso". (Citas omitidas.) *In re Pereira Esteves*, 131 D.P.R. 515 (1992).

---

[16] Una causa eximente a considerarse es la condición de recién admitido al ejercicio de la profesión. Un "período de gracia de dos (2) a tres (3) años" atenderías las dificultades envueltas en establecer una práctica. *Mandatory Pro Bono*, supra, pág. 381.

## XIV

En virtud de los fundamentos expuestos, y para salvar la constitucionalidad de la actual práctica de los tribunales de nombrar abogados de oficio para representar a los acusados indigentes —y sostener la designación del peticionario licenciado Ramos Acevedo— es impostergable reconocer, sin ambages, que existe un deber ético de todo abogado de prestar un mínimo de horas anuales de servicios "legales gratuitos a indigentes", que se extiende a cada uno de los miembros de la profesión legal. No puede ser de otra forma, pues el Canon 1 del Código de Ética Profesional, *supra*, única fuente positiva de este deber, *no hace distinción alguna.*

La mayoría pasa por alto el principio constitucional de un sistema judicial unificado y el presupuesto de uniformidad en las reglas de administración, y por ende, en la remuneración. En consecuencia, hasta tanto el Colegio de Abogados de Puerto Rico nos someta un Informe y adoptemos una propuesta integral para implantar de inmediato este mandato, fijaríamos mandatoriamente un mínimo de veinte (20) horas al año, susceptibles de ser sustituidas, total o parcialmente, mediante aportaciones económicas a razón de cincuenta dólares ($50) la hora, a ser remitidas a un Fondo Especial bajo la custodia del Colegio de Abogados. Dentro de noventa (90) días, todo abogado obligado por este deber ético según los términos de esta ponencia, rendiría a este Tribunal, por conducto del Colegio de Abogados, un informe exponiendo la forma y el momento en que lo cumpliría.

Sin menoscabo de que este Tribunal, mediante resoluciones al efecto, adopte las determinaciones y medidas que fueran necesarias para el fiel y adecuado cumplimiento o esclarecimiento de su mandato, devolveríamos los autos originales para que el foro de instancia, en virtud de los

criterios aquí formulados, determinara si procede a no asignarle una compensación al peticionario licenciado Ramos Acevedo por descargar su encomienda.

"[E]l Derecho es algo real y vivo, y algo con que inevitablemente se ha de tropezar, cada vez que se quiera transformar, para mejorarla, la condición de los hombres." Posada, *op. cit.*, pág. 8.